**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LIFESCIENCE TECHNOLOGIES, LLC, | **)** | |
| | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | Case No.: |
| | **)** | |
| MERCY HEALTH, MERCY ACO | **)** | **JURY TRIAL DEMANDED** |
| CLINICAL SERVICES, INC., d/b/a MERCY | **)** | |
| VIRTUAL, LLC, and | **)** | |
| MYIA LABS, INC., d/b/a MYIA HEALTH, | **)** | |
| | **)** | |
| Defendants. | **)** | |

## COMPLAINT

Plaintiff LifeScience Technologies, LLC (hereinafter "LST"), for its Complaint against Defendants Mercy Health ("Mercy Health"), Mercy ACO Clinical Services, Inc., d/b/a Mercy Virtual, LLC ("Mercy Virtual"), and Myia Labs, Inc., d/b/a Myia Health ("Myia"), alleges as follows:

NATURE OF THE CASE

1.      This is an action for breach of contract, trade secret misappropriation, unjust enrichment, unfair competition, civil conspiracy, and other related causes of action premised on Mercy Health's willful and deliberate disclosure of LST's trade secrets and confidential information to a third-party competitor (Myia) for purposes of developing a competing virtual care software platform.  Since Mercy Health opened Mercy Virtual in 2015, it has relied on the expertise of LST to deliver virtual patient care services through LST's m.Care platform (unless separately identified, hereafter Mercy Health and Mercy Virtual shall be jointly referred to as "Mercy").  Even though it was much smaller than Mercy Health from a revenue perspective, the

1

nimble LST team was experienced and had an innovative virtual patient care delivery system that was scalable to support the anticipated growth of Mercy Health's virtual patient care delivery services model. After utilizing the LST platform for a number of years, Mercy Health decided it would like to have its own virtual patient care software. To accomplish this, it allowed Myia's software development team improper access to LST's software using @Mercy.net credentials. After LST's secret and confidential information was disclosed, Mercy Health (through Mercy Virtual) acquired a $5 million ownership interest in Myia and its new virtual care software that was developed using LST's secret and confidential information. Once Mercy Health obtained its ownership interest, and Myia secured its investment capital, Mercy and Myia systematically and deliberately began implementing the Myia software at Mercy in place of LST's long-standing m.Care software.

2.      LST seeks relief against Mercy Health, Mercy Virtual, and Myia, jointly and severally, for utilizing its trade secrets and confidential information to develop a competing software product and using that new product to displace LST in the marketplace. LST seeks damages, punitive damages, attorneys' fees, and injunctive relief to prevent Myia, Mercy Health, and Mercy Virtual from continuing to utilize LST's trade secrets and confidential information for their own purposes and to the detriment of LST.

PARTIES

3.      LST is a limited liability company organized and existing under the laws of the State of Kansas, having a principal place of business at 5251 W. 116th Pl. Suite 200, Leawood, Kansas 66211.

4.      Upon information and belief, Mercy Health is a nonprofit corporation organized under the laws of the State of Missouri, and has a principal place of business located at 14528 South Outer Forty Road, Suite 100, Chesterfield, Missouri 63017.

5.      Upon information and belief, Mercy Virtual is a nonprofit corporation organized and existing under the laws of the State of Missouri, having a principal place of business at 14528 South Outer Forty Road, Suite 100, Chesterfield, Missouri 63017.

6.      Upon information and belief, Myia is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 99 Osgood Place, Suite 100, San Francisco, California 94133.

7.      Upon information and belief, Mercy Virtual serves as a legal contracting entity for Mercy Health.  Mercy Virtual's leadership reports to Mercy Health's senior leadership team, which includes Mercy Health's CEO Lynn Britton.  Mercy Virtual's funding comes in whole from Mercy Health.  As detailed below, Mercy Health executes contracts relating to, and in furtherance of, Mercy Virtual's business.

8.      Upon information and belief, Mercy Virtual only has two employees whose salary and benefits are paid for by Mercy Virtual.  The remaining people working at Mercy Virtual are all Mercy Health employees, hired at the direction of Mercy Health, paid by Mercy Health, and acting at Mercy Health's direction.  This includes, but is not limited to, the actors described below who approved and created Mercy e-mail accounts so Myia could access LST's software.

9.      Mercy Health has over 40,000 employees and reported an annual operating revenue in each of the last three years in excess of 4 billion dollars (USD).

10.      In its most recent tax filings, Mercy Virtual reported an annual revenue of over $62 million.

11.     As detailed herein, Mercy Health executed contracts with LST and directed other members of the Mercy Health team to execute contracts on its behalf through the Mercy Virtual entity.  Mercy Health also paid all moneys due LST during the course of their relationship.

12.     At all times detailed herein, Mercy Virtual was merely a conduit, or brand name, for virtual patient care services offered by Mercy Health.  Mercy Virtual could not make business decisions, execute contracts, or make financial commitments without approval or direction from Mercy Health.

13.     Mercy Virtual's leadership team (who upon information and belief are Mercy Health employees) reports directly to, and takes orders from, Mercy Health's leadership team.

14.     Mercy Health, and its employees, acting under the guise of Mercy Virtual, approved Myia's access to LST's trade secrets and confidential information, and ultimately gave Myia access to LST's software by creating Mercy Health e-mail accounts for the Myia software development team and enrolling those accounts in the LST software platform.  As detailed below, this activity was in breach of numerous agreements between Mercy Health/Mercy Virtual and LST, a violation of various statutes, and constituted various common law torts.  This wrongful conduct allowed Myia to develop a competing software product using LST's trade secret and confidential information and displace LST from its contracts with Mercy.  Mercy Health's activity also allowed Myia to compete, and win, other business using a platform developed with LST's trade secrets and confidential information.  Myia would not have been able to secure that business absent Myia's access to LST's secret and confidential information and Mercy Health's enablement of that access.  Then, Mercy Health provided $5,000,000 in funding to acquire an ownership interest in Myia, which it did through its Mercy Virtual brand.  Once it acquired an ownership interest in Myia, Mercy Health had an ownership interest in

Myia's software, which was built using LST's trade secret and confidential information.  This conduct has directly and proximately caused financial loss to LST and, among other things, unjustly enriched Myia and Mercy Health, as alleged herein.

15.     At all times alleged herein and for all wrongful conduct alleged, Mercy Health (A) exercised such dominion and control over Mercy Virtual that Mercy Virtual merely acted as a brand (or conduit) for Mercy Health's virtual health care services and (B) specifically directed Mercy Virtual to act in a manner that harmed LST.  As a result, Mercy Health is liable for the acts of Mercy Virtual.

## JURISDICTION AND VENUE

16.     This is an action for breach of contract, trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and Missouri Uniform Trade Secrets Act ("MUTSA"), Mo. Rev. Stat. §§ 417.450 *et seq.*, violations of the Missouri Computer Tampering Act, Mo. Rev. Stat. §§ 569.095 *et seq.*, tortious interference with a contract or business expectancy, unfair competition, and civil conspiracy under Missouri common law.

17.     The Court has jurisdiction under 28 U.S.C. § 1331 with respect to the asserted federal statutory claims. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 with respect to the state law claims. Jurisdiction is also proper before this Court pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy, excluding interest and costs, exceeds $75,000.  The Court has personal jurisdiction over Mercy Health and Mercy Virtual as they are incorporated in Missouri, have offices in this District, and transact business in this District.  The Court has personal jurisdiction over Myia as it knowingly transacts business in this District with Mercy Health, Mercy Virtual, Washington University in

St. Louis, and BJC Healthcare and the events giving rise to LST's causes of action took place in this District.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim at issue in this lawsuit occurred in this District and because Mercy Health, Mercy Virtual, and Myia are subject to personal jurisdiction here.

FACTUAL BACKGROUND

*LST Develops a Customized m.Care® Platform*

19.     LST is a software development company dedicated to developing and delivering innovative virtual patient care solutions.  One such solution, m.Care® (also referred to herein as "m.Care"), provides a comprehensive solution for physicians delivering virtual patient care.  For example, the m.Care® software integrates historical patient data for physicians to review and analyze, allows patients to connect monitoring devices like scales and sphygmomanometers for use in daily monitoring or virtual care visits, and allows patients and physicians to connect virtually using a smart phone or tablet.  In addition, the software: allows physicians to schedule patient activities like vital sign recordings; provides patient education; and uses healthcare data points to provide predictive analysis for delivering patient care.  This type of virtual patient care is particularly useful for helping physicians deliver care, and ensuring completion of patient responsibilities, for patients at home or that might otherwise have difficulty visiting a health care provider due to existing medical conditions.

20.     The lead software designer for m.Care is LST's Chief Technology Officer, Brent Kevern.  Mr. Kevern, who has a Master's Degree in Computer Science, had over 35 years of software development industry experience before spearheading software efforts at LST.  During

his time in the industry, Mr. Kevern became interested in using his computer science skills to help improve the provision of medical care.

21.     Mr. Kevern worked with physicians to develop software to facilitate heart valve transplants in children and software to ensure patient compliance after the heart transplant procedures.  He also developed monitoring software for infant cardiac patients that would run on an iPad that could be placed in a baby's nursery to monitor the baby's health and relay information to a hospital care team for timely action, if necessary.

22.     Mr. Kevern's experience, coupled with the experience of watching his son struggle with Stage 2 Hodgkin's Lymphoma, led him to devote all of his attention to the development of a comprehensive virtual care platform that could connect hospital-based teams more closely with home-based patients, which later became LST's m.Care System.

23.     The proprietary and innovative nature of LST's m.Care® platform has led to recognition and praise by customers—including Mercy—for its ability to seamlessly deliver virtual patient care and improve patient outcomes.

24.     LST maintains certain features, functionality, interfaces, documentation, and know-how associated with the m.Care platform as company trade secrets.

25.     m.Care is protected by confidentiality agreements and non-disclosure agreements at *every* health provider that utilizes the platform.  Access to the source code for m.Care is restricted and maintained in a secure repository.  Employee and management access to the m.Care platform is restricted within the company.  When LST deploys m.Care to health providers, it requires each provider to provide specific log-in credentials for everyone that accesses the system.  When LST demonstrates the system for potential customers, all customers sign NDAs prior to receiving technical information about the system.

26.     The LST trade secrets associated with m.Care provide a competitive advantage—and value—to LST by the fact that they are maintained as secrets.  For instance, LST's m.Care program offers features and functionality that give it a competitive advantage in the marketplace over competing products (e.g. superior functionality, system navigation, and back-end usability by physicians, etc.).  The manner by which LST maintains it trade secrets prevents competitors from reverse engineering and copying the m.Care product.  As a result, LST's trade secrets derive independent economic value for LST based on the fact that the information is a secret.

### *LST Begins its Relationship with Mercy*

27.     In October of 2015, Mercy Health opened the Mercy Virtual Care Center (also called Mercy Virtual).  The 125,000 square-foot building is the cornerstone of Mercy's virtual care program and, according to Mercy, serves as a nationally recognized center for developing and delivering telehealth.

28.     When Mercy opened its virtual care center in 2015, it needed a technology platform for its "vEngagement" project, and development team, where that platform and team had the capacity to grow quickly and understand individualized healthcare.  It chose LST's m.Care system as its technology platform.

29.     Dr. Tom Hale, MD, Ph.D, MS, the former CMO for Mercy Virtual, stated: "When I helped build the world's first virtual care center, I knew we needed the best technology available.  More importantly, we needed a team that was flexible and able to think innovatively as we were creating an entirely new care delivery model.  The choice was clear—m.Care provided the expertise, experience and creativity to power our success."

30.     In 2015, LST conducted a pilot program for use of the m.Care® platform with Mercy physicians and patients.  In connection with this pilot program, LST and Mercy executed

a series of agreements that included a Business Associate Agreement ("BAA") and a Mutual Non-Disclosure Agreement ("Mutual NDA"), which is attached hereto as **Exhibit 1.**[1]  The pilot program was a success and Mercy asked LST to further develop and expand its m.Care® platform for use in its patient population.  As a result, the parties executed a 2016 Master SaaS Agreement ("SaaS Agreement"), which is attached hereto as **Exhibit 2.**

31.     After only two years of utilizing LST's m.Care technology, Mercy had: reduced preventable readmissions by 52%; reduced medical spend by over 30%; increased outpatient service utilization by 20%; increased clinic office visits by 11%; and had 98% of patients who reported being "extremely satisfied/satisfied" with the program.

32.     Over the next few years, the LST-Mercy relationship expanded as Mercy wanted to increase its utilization of LST's services.  As a result, in 2018, the parties agreed to a Professional Master Services Agreement ("PMSA"), which is attached hereto as **Exhibit 3**.

33.     In 2018, Mark Saxon, Mercy Virtual's Vice President of Clinical Operations stated: "m.Care's technology gives us the flexibility to cover any patient population at anytime, anywhere.  It can be adapted to the individual, or to the whole program.  m.Care is very patient-centric, and they care.  Their technology allows the flexibility for future growth, which we need. For those reasons, they align better with us than other organizations."

34.     Over the course of the LST-Mercy relationship, LST performed over 50 Statements of Work requested by Mercy.

35.     LST's m.Care technology improved patient care and patient outcomes as objectively tracked by Mercy.

---

[1] The Mutual NDA, SaaS Agreement, and PMSA, which are the subject of this lawsuit are governed by confidentiality provisions and contain sensitive LST and Mercy business information.  As a result, LST has sought leave to file these attachments under seal.

### *Mercy Agreed to Protect the Confidentiality of LST's Proprietary Software*

36.     The Mutual NDA, SaaS Agreement, and PMSA all make clear that LST's m.Care® platform, and related confidential or trade secret information, are to be treated as confidential, not disclosed by Mercy to any third party, and may only be used for LST-Mercy business purposes.  This protection is important to LST, as maintaining the confidentiality of certain m.Care® features, functionality, know-how, and code is one of the main ways LST ensures that the substantial time, effort, and expense devoted to software development remains the property of LST.

37.     The Mutual NDA is between Mercy Health and LST.  The Mutual NDA is governed and interpreted according to the laws of the State of Missouri and was executed by Scott Richert, Mercy Health's current Chief Information Officer.

38.     The Mutual NDA prohibited Mercy from sharing LST's "Confidential Information" which was defined as "all confidential, proprietary, trade-secret, private, personal, sensitive, and all other information and data relating to the disclosing's Party's operations." **Exhibit** 1 ¶ 2.[2]

39.     The Mutual NDA provided that the parties intend for all non-public information "shared between the Parties shall be deemed to be Confidential Information governed by the obligations of nondisclosure and restricted use set forth herein."  *Id.*

40.     The Mutual NDA further specified that "Confidential Information shall not be used by a receiving Party except in furtherance of the mutually beneficial business purpose of the Parties."  *Id.* at ¶ 8.

---

[2] For purposes of this Complaint, whenever LST refers to Confidential Information, it shall include the definitions of such information as stated in the Mutual NDA and SaaS Agreement.

41.     If there is a breach of the Mutual NDA, Mercy agreed that money damages would not be a sufficient remedy for any breach and further agreed that LST would be "entitled to payment of its legal fees and disbursements, court costs and other expenses of enforcing, defending, or otherwise protecting its interests" under the Mutual NDA. *Id.* at ¶ 11.

42.     The SaaS Agreement incorporated the confidentiality obligations of the Mutual NDA. **Exhibit 2** ¶ 16.

43.     The SaaS Agreement is between Mercy Virtual and LST.  The SaaS Agreement is governed and interpreted according to the laws of the State of Missouri and was executed by Michael Chappuis, former Chief Administration Officer for Mercy Virtual.

44.     The SaaS Agreement required Mercy to treat LST's system, system specifications, requirements, features, and other Confidential Information as confidential.  The SaaS Agreement defined LST's "Confidential Information" as "confidential or proprietary information, including by way of example and not limitation, information related to: market share, unpublished patents, patentable ideas, customer information . . . research and testing knowledge and results . . . designs, custom calculations, custom displays, specifications, methodologies, and know-how . . . ." *Id.* at ¶ 2.2.

45.     The SaaS Agreement also defined "LST Property" as the "Services, Software, Updates and Releases, LST's Intellectual Property Rights, LST's Confidential Information and all hardware tools, ideas, concepts, methodologies, processes, inventions and utilities developed by or on behalf of LST . . . ." *Id.* at ¶ 2.8.

46.     The SaaS Agreement provided that Mercy was not allowed to directly, or indirectly "modify, adapt, translate, reverse engineer, decompile, disassemble, or create derivative works based on the LST Property, in whole or in part, nor modify, adapt, translate or

create derivative works based on the LST Property, in whole or in part, without the prior written consent of LST."  *Id.* at ¶ 8.2.

47.     Mercy agreed that if it breached its confidentiality obligations under the SaaS Agreement, any agreed upon limitations for damages would not apply.  *Id.* at ¶ 23.

48.     The PMSA defines Confidential Information in a manner similar to the SaaS Agreement and places similar restrictions on the disclosure of such information by Mercy. PMSA ¶ 1.2.

49.     The PMSA is between Mercy ACO Clinical Services, Inc. (d/b/a Mercy Virtual) and LST.  The PMSA is governed and interpreted according to the laws of the State of Missouri and was executed by Dr. Gavin Helton, President of Clinical Integration for Mercy Virtual.

50.     The PMSA further defines "Vendor Software" as LST's "proprietary software, including m.Care also known as LSTCare®, suite of applications, code, software developed pursuant to any SOW, and any Vendor owned or Vendor controlled software that is installed on products, developed for or otherwise used by Customer [Mercy] as agreed upon in a SOW and all Updates and Upgrades."  *Id.* at ¶ 1.2.

51.     As part of the PMSA, Mercy agreed that it "shall not, and shall not authorize any third party to: (i) translate, reverse engineer, decompile, disassemble, attempt to derive the source code of any Vendor Software provided to Customer solely in object code form; (ii) modify or create any Derivative Worlds to the Vendor Software . . . ."  *Id.* at ¶ 4.8.

52.     Mercy also agreed that it would not disclose LST's Confidential Information "to any contractor or other third party . . . without prior, written approval" from LST and that it will "protect such Confidential Information from inadvertent disclosure to a third party" and that it

would not use LST's Confidential Information except for performance of its obligations under
the PMSA.  *Id.* at ¶ 12.1.

53.    Mercy was also required to "ensure that each of its employees, officers, directors,
or agents who has access to [LST's] Confidential Information disclosed under this PMSA is
informed of its proprietary and confidential nature and is required to abide by the terms of this
PMSA."  *Id.*

54.    Mercy agreed that if it breached its confidentiality obligations under the PMSA,
any agreed upon limitations for damages would not apply.  *Id.* at ¶ 13.19.

***Mercy Gave Myia Access to Reverse Engineer LST's m.Care Software, Acquired a $5 Million
Ownership Interest in Myia, Then Replaced LST's Software with Myia's Derivative Software***

55.    Upon information and belief, sometime in 2018 Mercy and Myia began working
together to build a virtual patient care platform for use at Mercy.

56.    Upon information and belief, Dr. Christopher Schlanger, and perhaps other
members of the Mercy leadership team, had a relationship with Myia executives and worked to
promote Myia internally at Mercy.

57.    Sometime in 2018—while Mercy was utilizing LST's m.Care platform—the
Mercy leadership team announced to Mercy employees that they were bringing Myia onboard to
co-develop a virtual patient care platform for use by Mercy.

58.    Upon information and belief, when Myia started working with Mercy, it did not
have a completed virtual patient care platform that could be utilized by patients or healthcare
professionals.

59.    Upon information and belief, when Myia started working with Mercy, it did not
have a virtual patient care platform that was ready for immediate deployment at Mercy.

60.     When Myia first began working with Mercy, it was interested in learning about the proprietary and confidential LST m.Care platform and all of its capabilities.

61.     To further Myia's product development, Mercy's leadership team, including upon information and belief, Director Kelly Matusofsky, made the decision to grant Myia access to LST's m.Care software[3]—which included access to LST's trade secrets and Confidential Information.  This decision was made with full knowledge of Mercy's confidentiality obligations to LST.

62.     Sheila Vlaich, Mercy Project Manager, created Mercy login credentials for Myia personnel.

63.     The login credentials granted to Myia by Mercy allowed Myia personnel access to the m.Care platform utilizing @Mercy.net logins.

64.     These unauthorized Myia logins, which utilized Mercy credentials, were not readily detectable to LST personnel.

65.     Some of the Myia personnel granted access to LST's m.Care software by Mercy include:

    a.   Tammy Chang, Myia Lead Product Developer;

    b.   Martyn Taylor, Myia VP of Engineering;

    c.   Sonia Koesterer, Myia Head of Design;

    d.   Reeve Thompson, Myia Chief Product Officer; and

    e.   Andre Dias, Myia Head of Commercial and Customer Success.

66.     The individuals identified in the immediately preceding paragraph used the following login credentials to access LST's m.Care software:

---

[3] The term platform and software is used interchangeably in connection with m.Care herein and includes the LST trade secrets and Confidential Information that are the subject of this Complaint.

     a.   TAMMY.CHANG@MERCY.NET

     b.   MARTYN.TAYLOR@MERCY.NET

     c.   SONIA.KOESTERER@MERCY.NET

     d.   REEVE.THOMPSON@MERCY.NET

     e.   ANDRE.DIAS@MERCY.NET

67.    Other Myia personnel also accessed LST's m.Care software.

68.    Upon information and belief, Myia's European software development team also had access to LST's m.Care software.

69.    From at least August 14, 2019 through at least July 24, 2020, Myia personnel were accessing LST's m.Care platform.

70.    At least 1,300 transactions inside the LST m.Care platform were conducted by Myia personnel from an IP address tied to Myia in San Francisco, California.

71.    For example, "Sonia M" with an IP address traced to Myia (136.24.115.10), was signed in to m.Care as a patient using an iOS device running iOS12.3 and version 5.69 of the m.Care platform on January 7, 2020.  This user performed the following tasks:

     a.   reviewed the medication list for the patient;

     b.   reviewed appointments assigned to the user;

     c.   examined the patient dashboard;

     d.   responded to an announcement message presented;

     e.   began using the integrated video conferencing system;

     f.   exited video conferencing;

     g.   examined surveys assigned to the patient;

     h.   took a survey and submitted an answer;

   i. navigated back to the dashboard; and

   j. accessed the spoken request AI system built into the platform.

  72. As another example, "Tammy C" with an IP address traced to Myia (136.24.115.10), was signed in to m.Care as a patient using an iOS device running iOS12.3 and version 5.69 of the m.Care platform on November 12, 2019.  This user performed the following tasks:

   a. searched for patients (actual Mercy Health patients serviced by Mercy Virtual);

   b. located a patient and examined the demographic data for the patient;

   c. reviewed the team member note taking page that allows a care team member to record notes on patient interactions; and

   d. reviewed that same patient's measurements and vital signs.

  73. In addition, Myia personnel also accessed LST's m.Care software in St. Louis during site visits to Mercy in St. Louis using one or more of the login credentials identified in herein.

  74. Mercy also gave Myia access to a generic user account called "Test Patient," which was used by Myia in California and during its site visits to St. Louis.

  75. From its California location, Myia conducted over 2300 transactions in the m.Care software using the Test Patient account.

  76. During the time Myia was in LST's software, there were over 12,000 transactions associated with this Test Patient account.

  77. Myia utilized the information it gleaned from LST's m.Care software—which included LST's protected trade secrets and Confidential Information—to design, build, and

create its own virtual patient care software, which upon information and belief is coded in a different computer language (the "Derivative Software").

78.   Mercy assisted Myia in the design and creation of its Derivative Software.

79.   The Myia Derivative Software has similar features and functionality to LST's m.Care software.

80.   As defined by LST's Mutual NDA, SaaS Agreement, and PMSA with Mercy, Myia utilized LST Confidential Information in the creation of its Derivative Software.

81.   By reviewing and studying LST's m.Care software—which included LST's protected trade secrets and Confidential Information—to reverse engineer, design, and develop its own software, Myia capitalized on years of LST research, know-how, negative know-how, design, and programming work to create a competing product (the Derivative Software) in a fraction of the time it took LST to build its product from the ground up.

82.   At the same time Myia had access to LST's m.Care system, Mercy acquired an ownership stake in Myia for $5 million.

83.   Upon information and belief, Mercy's agreement to acquire a $5 million ownership interest was finalized in September of 2019.  *See* Mobile Health News, *https://www.mobihealthnews.com/news/north-america/mercy-virtual-leads-10m-investment-myia-labs-rolls-out-home-monitoring-tech* (last visited October 25, 2021).

84.   The decision to invest in Myia came from Mercy's leadership team, including, but not limited to, Dr. Gavin Helton, President of Clinical Integration.

85.   Upon information and belief, Mercy Health funded Mercy Virtual for purposes of completing the acquisition of Myia ownership interest, and all approvals for the use of those funds had to be obtained from Mercy Health.  At all times during the development of Myia's

Derivative Software, Mercy Health was directing, controlling, funding, and approving the decisions made by Mercy Virtual.

86.    Once Myia's Derivative Software was functionally capable of replacing LST's m.Care software—and after it had acquired an ownership interest in the software—Mercy began implementing Myia's Derivative Software in place of LST's m.Care software.

### *Mercy's Conduct Breached its Agreements with LST*

87.    Upon information and belief, Mercy failed to ensure that each of its employees, officers, directors, or agents that had access to LST's Confidential Information was informed of the proprietary and confidential nature of LST's Confidential Information.  This alone is a breach of, at least, the PMSA.

88.    By intentionally granting Myia access to LST's m.Care software, and allowing third party Myia to reverse engineer, study, and create a Derivative Software platform based on LST's Vendor Software and Confidential Information, Mercy has breached the Mutual NDA, SaaS Agreement, and PMSA.

89.    Mercy utilized LST's m.Care software for purposes other than those permitted by the agreements, and for Mercy's financial benefit, by allowing a third party to obtain access to the software in order to develop a competing software product (the Derivative Software) that Mercy then acquired an ownership interest in—to the detriment of LST.  In addition, allowing a third-party competitor access to LST's m.Care software is not in furtherance of a mutually beneficial business purpose between LST and Mercy.  These acts are in breach of the Mutual NDA, SaaS Agreement, and PMSA.

*Myia Utilized LST's Confidential and Secret Information to Compete with LST*

90.     Upon information and belief, Myia is actively selling, and offering for sale, its Derivative Software that it created using LST's trade secrets and Confidential Information to other customers.

91.     Myia is using LST's trade secrets and Confidential Information to compete directly with LST for business.  For instance, in late 2019/early 2020 both LST and Myia were finalists for an opportunity to provide patient care solutions to BJC in St. Louis.  On February 28, 2020, BJC notified LST that it had selected Myia for the opportunity.

92.     Using LST's trade secrets and Confidential Information acquired through Mercy's inappropriate sharing of LST's software, Myia obtained the contract to service Mercy's patients with the Myia Derivative Software—a contract that had previously been awarded to LST.

93.     Upon information and belief, the trade secrets and Confidential Information Myia obtained from LST's m.Care software allowed Myia to obtain contracts to provide virtual care services with Baylor University and the Virginia Heart Institute.

*Mercy and Myia's Conduct Was Willful and Deliberate*

94.     Mercy and its leadership team were aware of its contractual obligations to LST.

95.     Mercy was aware that it owed LST a duty to protect—and not disclose—LST's Confidential Information (which includes trade secrets) as defined by the parties' agreements described herein.

96.     Mercy was aware that it could not permit Myia—a third party competitor of LST—to access LST's trade secrets and Confidential Information.

97.     Mercy was aware that it had an obligation to ensure that any employee, officer, director, or agent who had access to LST's trade secrets and Confidential Information took measures to protect LST's trade secrets and Confidential Information.

98.     Mercy, through its leadership team, made the strategic decision to allow Myia access to LST's trade secrets and Confidential Information so that Myia could make a competing software product to service Mercy and its patients.  Upon information and belief, sometime in late 2018, a leadership team consisting of Kelly Matusofsky, Dr. Justin Huynh, and Dr. Christopher Schlanger worked with Myia to develop the Derivative Software for Mercy.  To facilitate this software development, one or more of the aforementioned individuals ordered Mercy personnel—including, but not limited to Sheila Vlaich—to create LST software login credentials for the Myia development team using Mercy e-mail accounts.

99.     By using Mercy e-mail accounts for Myia individuals, the corporate identities of the Myia development team that was accessing LST's trade secrets and Confidential Information were disguised and it appeared as if the individuals accessing the system were Mercy employees.

100.    From at least August 14, 2019 through July 24, 2020, Myia personnel were active in LST's m.Care platform with the full knowledge and direction of Mercy personnel.

101.    Dr. Gavin Helton was aware that Myia had access to LST's m.Care platform.

102.    Members of Mercy's leadership team were aware that Myia had access to LST's m.Care platform.

103.    Dr. Gavin Helton was aware that Myia had access to LST's Confidential Information.

104.    Members of Mercy's leadership team were aware that Myia had access to LST's Confidential Information.

105.    Dr. Gavin Helton was aware that Myia had access to LST's trade secrets.

106.    Members of Mercy's leadership team were aware that Myia had access to LST's trade secrets.

107.    Dr. Gavin Helton knew that Myia's access to LST's trade secret and Confidential Information was in breach of one or more agreements Mercy had with LST.

108.    Members of Mercy's leadership team were aware that Myia's access to LST's trade secrets and Confidential Information was in breach of one or more agreements Mercy had with LST.

109.    The Myia personnel that had access to LST's Confidential Information were involved in software product development or design.

110.    In or around September 2019—after Myia accessed LST's trade secrets and Confidential Information to begin developing its Derivative Software—Mercy invested $5 million in Myia for an ownership interest in the company.

111.    According to Dr. Gavin Helton, Mercy invested in Myia so that the two companies could "spend significant time and effort co-developing and helping guide development" of the Myia Derivative Software.  *See, CNBC.COM, https://www.cnbc.com/2019/09/01/myia-and-other-smart-device-makers-are-tracking-chronic-illnesses.html* (last visited October 25, 2021).

112.    Myia's access of LST's platform was in breach of one or more of the agreements Mercy had with LST.

113.    Mercy personnel knew that when it allowed Myia access to LST's m.Care platform, it was in breach of one or more of the agreements it had with LST.

114.    Mercy never asked LST if Myia could have access to the m.Care platform.

115.     Myia never asked LST if it could have access to the m.Care platform.

116.     Mercy was incentivized to allow Myia access to LST's trade secrets and Confidential Information so that Myia—which Mercy owns a percentage of—could efficiently and quickly develop competing software with features similar to LST's m.Care.

117.     Mercy knew that Myia was using LST's trade secrets and Confidential Information to design, develop, or improve upon its own patient care software product.

118.     The more successful Myia is at software development and procuring new customer contracts, the more valuable Mercy's ownership stake in Myia becomes.

119.     Myia knew that its access to LST's trade secrets and Confidential Information was not allowed, but chose to access LST's trade secrets and Confidential Information regardless.

120.     Myia keeps its own software, software documentation, and related product features confidential.

121.     Myia does not allow third party competitors, like LST, to have access to its software.

122.     Myia has never allowed LST to have access to its software.

123.     Myia did not seek permission from LST to access the m.Care platform.

124.     Myia did not seek permission from LST to access its Confidential Information.

125.     Myia did not seek permission from LST to access its trade secrets.

126.     Through its experience with Mercy and with its own product, Myia knew that LST's m.Care software was confidential and that it should not have access to the system.

127.     Despite this knowledge, Myia accessed LST's trade secrets and Confidential Information in order to facilitate its own product development and secure a funding investment from Mercy (and others).

128.     Myia intentionally accessed LST's trade secrets and Confidential Information, with the help of Mercy, and benefited by, among other things, accelerating its product development and securing funding from investors.  Among those Myia personnel that accessed LST's Confidential Information, with the assistance of Mercy, include: Tammy Chang, Myia Lead Product Developer; Martyn Taylor, Myia VP of Engineering; Sonia Koesterer, Myia Head of Design; Reeve Thompson, Myia Chief Product Officer; and Andre Dias, Myia Head of Commercial and Customer Success.

129.     On numerous occasions between at least August 2019 and July 2020, members of the Myia development team visited Mercy in St. Louis.

130.     When Myia personnel were in St. Louis on Mercy's campus, they accessed LST's m.Care software.

131.     When Myia personnel were in St. Louis on Mercy's campus, they accessed LST's Confidential Information.

132.     When Myia personnel were in St. Louis on Mercy's campus, they accessed LST's trade secrets.

133.     Myia used LST's trade secrets and Confidential Information to further enhance, develop, or customize its Derivative Software.

134.     When it was working with Mercy, Myia developed a software product that could replace LST's m.Care platform.

135.    Myia used LST's trade secrets or Confidential Information to develop a software product that could replace LST's m.Care platform.

### *Harm to LST from Mercy and Myia's Conduct*

136.    LST has suffered damages as a result of Mercy and Myia's actions.  LST is at further risk of suffering additional and substantial financial damages, and irreparable harm, if Myia (& Mercy) is allowed to continue developing and/or selling Myia's Derivative Software that was created while contemporaneously using LST's trade secrets and Confidential Information.

137.    LST invested years and millions of dollars developing its proprietary m.Care software.  The software is the result of specific research and development, know how, negative know how, and has been refined over the years to enhance the product's usability and performance.  Myia and Mercy are attempting to usurp and take advantage of LST's skill, time, expense, investments, trade secrets, and Confidential Information to build upon and duplicate the m.Care software without expending any of the substantial resources that would be necessary to create such a product.

138.    Permitting Mercy and Myia to benefit from spending nearly a year studying LST's trade secrets and Confidential Information for the purposes of contemporaneously creating the Derivative Software product provides an unfair advantage and massive cost-savings in creating that new product.  Moreover, it allows Myia to analyze and determine specific, detailed features and functionality that the LST product may or may not have, in order to create a product, and more effectively market that product, to compete with LST in the marketplace. These are the reasons why LST protects its software deployment with NDAs and various confidentiality provisions in its SaaS and other agreements.  Allowing Myia to continue offering

for sale, selling, licensing, and/or deploying the Derivative Software would provide Myia with an

unfair advantage in the marketplace and has caused—and will continue causing—harm to LST in

the marketplace in the form of lost customers, loss of business opportunities, loss of reputation,

and diminished goodwill.

139.    LST has also been damaged because its proprietary, confidential, and trade secret

information has been viewed by Myia developers—some of whom are no longer with the

company.  Upon information and belief, LST trade secret and Confidential Information has also

been incorporated into Myia's product, which greatly diminishes—or outright destroys—the

competitive and financial value associated with the information compared to when it was a

secret.

**COUNT 1: Breach of Contract**
**Against Mercy Health and Mercy Virtual**
**(Breach of the Mutual NDA, SaaS Agreement, and PMSA)**

140.    LST incorporates by reference all of the allegations in each of the preceding

paragraphs above as if fully set forth herein.

141.    The Mutual NDA, SaaS Agreement, and PMSA Agreement are valid, legally

binding contracts governing the relationship between LST and Mercy.

142.    At all times hereto, LST substantially performed its obligations under the Mutual

NDA, SaaS Agreement, and PMSA.

143.    As detailed above, Mercy materially breached its obligations to LST, including

but not limited to:

   a.  Mutual NDA: ¶¶ 3, 8;

   b.  SaaS Agreement: ¶¶ 3.2, 8.2, 16; and

   c.  PMSA: ¶¶ 4.8, 12.1.

144.     As a result of the foregoing conduct, and as a direct and proximate result of Mercy's numerous contract breaches, LST has been damaged in an amount to be determined at trial, which includes, but is not limited to lost revenues, asset destruction, lost profits, and investigative costs.  In addition, LST has incurred, and will continue to incur additional damages, costs, expenses, and attorneys' fees resulting from Mercy's breaches—which are expressly recoverable under ¶ 11 of the Mutual NDA and related agreements that incorporate the same provision.

145.     As a result of the foregoing conduct, and as a direct and proximate result of Mercy's numerous contract breaches, Mercy has caused, and will continue to cause immediate and irreparable harm to LST for which there is no adequate remedy at law.  Mercy specifically acknowledged that should it be in breach of the Mutual NDA "money damages would not be a sufficient remedy for a breach" and that LST would be "entitled to seek specific performance, injunctive relief or any other forms of equitable relief as a remedy for any breach of this Agreement" and that such relief "shall not be deemed exclusive, but shall be in addition to all other remedies available at law or in equity."  Mutual NDA ¶ 11.

**COUNT 2: Trade Secret Misappropriation**
**Against Mercy Health, Mercy Virtual, and Myia**
**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)**

146.     LST incorporates by reference all of the allegations in each of the preceding paragraphs above as if fully set forth herein.

147.     LST owns trade secrets that are embodied in the Confidential Information (as defined by the contracts) and m.Care software, which is used in, or intended for use in, interstate commerce.

148.    The LST trade secrets include, but are not limited to, information in the source code, object code, and executable programs of the m.Care software; the designs, schematics, documentation, logic, know how, negative know how, logic flow for the m.Care system; and certain program capabilities of the m.Care system.

149.    The LST trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from knowing such information.  The LST trade secrets give LST an advantage over its competition in the market for companies offering virtual patient care software and services.  Evidence of this value is that Myia sought to examine, study, copy, and reverse engineer LST's m.Care software, and has already licensed/sold its competing software product to Mercy and others.

150.    LST has taken reasonable efforts to maintain the secrecy of its trade secrets and m.Care software by, among other things, restricting access to its trade secrets and requiring Mercy (and its other customers) to maintain the confidentiality of the information through appropriate non-disclosure agreements.

151.    Mercy has misappropriated LST's trade secrets, under the Defend Trade Secrets Act, 18 U.S.C. § 1836, by intentionally giving Myia access to those trade secrets, through interstate commerce, for purposes of reverse engineering and developing a competing software product—which Mercy has an ownership interest in by way of its investment in Myia—to replace LST's m.Care software.

152.    Myia has misappropriated LST's trade secrets, under the Defend Trade Secrets Act, 18 U.S.C. § 1836, by reviewing and studying them, in interstate commerce, through the user logins it obtained through Mercy and by incorporating some, or all, of LST's trade secrets into its

Derivative Software product, which it has then disclosed to third parties such as BJC in interstate commerce.

153.    LST has suffered and will continue to suffer immediate and irreparable harm without an adequate remedy at law if Mercy and Myia are not enjoined from misappropriating LST's trade secrets.  Specifically, LST is in immediate danger of the wrongful and continued use of its trade secrets in the Myia software.

154.    LST will suffer, and will continue to suffer, damages as a result of such misappropriation and use of its trade secret information.  Such damages include, but are not limited to actual damages, lost profits, unjust enrichment to Defendants, a reasonable royalty, and exemplary damages.

155.    Mercy and Myia's misappropriation is willful and malicious.  Mercy intentionally disclosed LST's trade secrets to Myia, and Myia knowingly received such trade secrets, in an effort to develop a competing software product that could displace LST's m.Care system.  This allowed Myia to improperly develop the Derivative Software and market against LST using LST's trade secrets and obtain $10 million in funding from investors—one of which was Mercy. Mercy was able to use LST's trade secrets to have a third-party competitor of LST (Myia) develop the Derivative Software it could use to replace LST's m.Care and then eventually acquire an interest in the software by purchasing an equity position in Myia.  Mercy and Myia knowingly and intentionally intended to steal and profit from LST's intellectual property, warranting an award of exemplary damages and attorneys' fees.

156.    In the alternative, Mercy and Myia's misappropriation is willful and malicious because of its reckless indifference to LST's rights, warranting an award of exemplary damages and attorneys' fees.

**COUNT 3: Trade Secret Misappropriation**
**Against Mercy Health, Mercy Virtual, and Myia**
**(Violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450 *et seq*.)**

157.     LST incorporates by reference all of the allegations in each of the preceding paragraphs above as if fully set forth herein.

158.     LST owns trade secrets that are embodied in the Confidential Information (as defined by the contracts) and m.Care software, which is used in, or intended for use in, interstate commerce.

159.     The LST trade secrets include, but are not limited to, information in the source code, object code, and executable programs of the m.Care software; the designs, schematics, documentation, logic, know how, negative know how, logic flow for the m.Care system; and certain program capabilities of the m.Care system.

160.     The LST trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from knowing such information.  The LST trade secrets give LST an advantage over its competition in the market for companies offering virtual patient care software and services.  Evidence of this value is that Myia sought to examine, study, copy, and reverse engineer LST's m.Care software, and has already licensed/sold its competing software product to Mercy and others.

161.     LST has taken reasonable efforts to maintain the secrecy of its trade secrets and m.Care software by, among other things, restricting access to its trade secrets and requiring Mercy (and its other customers) to maintain the confidentiality of the information through appropriate non-disclosure agreements.

162.    Mercy has misappropriated LST's trade secrets under the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450 *et seq.*, by intentionally giving Myia access to those trade secrets, through interstate commerce, for purposes of reverse engineering and developing the Derivative Software product—which Mercy has an ownership interest in by way of its investment in Myia—to replace LST's m.Care software.

163.    Myia has misappropriated LST's trade secrets under the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450 *et seq.*, by reviewing and studying them, in interstate commerce, through the user logins it obtained through Mercy and by incorporating some, or all, of LST's trade secrets into its Derivative Software, which it has then disclosed to third parties such as BJC in interstate commerce.

164.    The Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450 *et seq.*, provides that "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined;" that a "complainant is entitled to recover damages for misappropriation;" that under appropriate circumstances "the court may award punitive damages;" and that "affirmative acts to protect a trade secret may be compelled by court order."

165.    LST has suffered and will continue to suffer immediate and irreparable harm without an adequate remedy at law if Mercy and Myia are not enjoined from misappropriating LST's trade secrets.  Specifically, LST is in immediate danger of the wrongful and continued use of its trade secrets the Derivative Software.

166.    LST will suffer, and will continue to suffer, damages as a result of such misappropriation and use of their trade secret information.

167.    Mercy and Myia's misappropriation is outrageous because of its evil motive. Mercy intentionally disclosed LST's trade secrets to Myia, and Myia knowingly received such

trade secrets, in an effort to develop a competing software product that could displace LST's m.Care system.  This allowed Myia to improperly develop the Derivative Software and market against LST using LST's trade secrets and obtain $10 million in funding from investors—one of which was Mercy.  Mercy was able to use LST's trade secrets to have a third-party competitor of LST (Myia) develop the Derivative Software so that it could replace LST's m.Care and then eventually acquire an interest in the Derivative Software by purchasing an equity position in Myia.  Mercy and Myia knowingly and intentionally intended to steal and profit from LST's intellectual property, warranting an award of punitive damages.

168.    In the alternative, Mercy and Myia's misappropriation is outrageous because of its reckless indifference to LST's rights, warranting an award of punitive damages.

**COUNT 4: Violation of the Missouri Computer Tampering Act**
**Against Mercy Health, Mercy Virtual, and Myia**
**(Mo.  Rev. Stat. §§ 569.095 *et seq.*)**

169.    LST incorporates by reference all of the allegations in each of the preceding paragraphs above as if fully set forth herein.

170.    As a result of LST's contractual relationship with Mercy, Mercy had access to LST data, programs, and supporting documentation.

171.    The data, programs, and supporting documentation existed both internal and external to a computer, computer system, and computer network.

172.    In Myia's efforts to reverse engineer LST's confidential m.Care software, Mercy disclosed and Myia received, reviewed, modified, and took LST's data, programs, supporting documentation, and related information in violation of Mo. Rev. Stat. §§ 569.095 *et seq.*

173.    Specifically, Mercy employees disclosed the entirety of LST's confidential m.Care software to Myia.  Myia then took, modified, and/or further disclosed to third parties

LST's confidential information in the form of designs, information, documentation, logic, and the resulting Derivative Software.

174.    Mercy knowingly modified, disclosed, and assisted Myia in taking this information without authorization and without reasonable grounds to believe that they had such authorization as Mercy was contractually obligated to protect and not disclose LST's Confidential Information.

175.    Myia knowingly received from Mercy, modified, and further disclosed to third parties, LST's Confidential Information without authorization and without reasonable grounds to believe that they had such authorization.

176.    Section 537.525 of the Missouri Computer Tampering Act provides that "the owner of lessee of the computer system, computer network, computer program, computer service or data may bring a civil action against any person who violates Sections 569.095 to 569.099 for compensatory damages" and can recover reasonable attorneys' fees.

177.    Through the conduct described above, Mercy and Myia have violated the Missouri Computer Tampering Act.

178.    LST has suffered and will continue to suffer damages as result of Mercy and Myia's conduct.

179.    LST has suffered and will continue to suffer immediate and irreparable harm without any adequate remedy at law if Mercy and Myia are not enjoined from further modifying, disclosing, and taking of any LST data, programs, design elements, and supporting documents. LST is in immediate danger of diminution of its business reputation and goodwill.

### COUNT 5: Unjust Enrichment
### Against Mercy Health, Mercy Virtual, and Myia
### (Missouri Common Law)

180.    LST incorporates by reference all of the allegations in each of the preceding paragraphs above as if fully set forth herein.

181.    Mercy and Myia's aforementioned conduct of accessing and using LST's m.Care software for competitive software development purposes conferred upon Mercy and Myia a substantial benefit and economic advantages that rightfully belong to LST.

182.    Mercy and Myia enjoyed, and continue to enjoy, the benefits and economic advantages, at the expense of LST based on Mercy and Myia's use and misuse of LST's intellectual property, without compensating LST for the value of the benefits conferred—all of which were obtained, received, and/or enjoyed under inequitable and unjust circumstances.

183.    Mercy and Myia accepted and retained the benefits such that they should be ordered by this Court to reimburse LST for the full value of the benefits conferred and ordered to return or destroy, or otherwise as provided by the Court in its equitable powers, the Confidential Information, Derivative Software, and other tangible property that rightfully belongs to LST.

### COUNT 6: Civil Conspiracy
### Against Mercy Health, Mercy Virtual, and Myia
### (Missouri Common Law)

184.    LST incorporates by reference all of the allegations in each of the preceding paragraphs above as if fully set forth herein.

185.    Myia and Mercy acted together for the purposes of giving Myia access to LST's trade secrets and Confidential Information—in violation of the Mutual NDA, SaaS Agreement, PMSA Agreement, and other statutes and torts described herein—for the purpose of facilitating development of a competing virtual care software platform and securing an ownership stake

therein.  Mercy intentionally and knowingly furthered the conspiracy by providing @Mercy.net logins for LST's m.Care software to Myia personnel at the request of Myia.  Myia used the trade secrets and Confidential Information it accessed with its @Mercy.net logins to the m.Care software to develop the Derivative Software—with the continued assistance of Mercy—and attract a $5,000,000 investment from Mercy, who consequently gained an ownership interest in Myia and the Derivative Software product that was constructed with LST's trade secrets and Confidential Information.

186.    Mercy and Myia's conduct was outrageous because of its reckless and evil motive.  Mercy and Myia knew their conduct was tortious, or otherwise wrongful, in violation of LST's rights and interests, but acted in blatant disregard of LST's rights and interests.  Mercy and Myia knowingly and intentionally intended to steal and profit from LST's intellectual property, warranting an award of punitive or exemplary damages.

187.    As a direct and proximate result of Myia and Mercy's conspiracy, LST has been damaged in an amount to be determined at trial, including, but not limited to LST's actual damages, lost profits, research and development costs, and Mercy and Myia's unjust enrichment.

**COUNT 7: Unfair Competition**
**Against Mercy Health, Mercy Virtual, and Myia**
**(Missouri Common Law)**

188.    LST incorporates by reference all of the allegations in each of the preceding paragraphs as if fully set forth herein.

189.    Mercy Health, Mercy Virtual, and Myia have taken, among other things, LST's Confidential Information and, in connection with marketing of Myia's Derivative Software, represented to customers and prospective customers that such software was designed, developed, and the property of Mercy Health, Mercy Virtual, and/or Myia.

190.    Myia employees, with the assistance of Mercy Health and Mercy Virtual accessed LST's Confidential Information and incorporated that information into the Derivative Software and have also represented to customers and potential customers that it independently invented and developed the Derivative Software—and its functions and features—without access to LST's Confidential Information.

191.    Mercy Health, Mercy Virtual, and Myia's representations are deceptive and misleading, and, upon information and belief, is causing prospective customers to believe that Mercy Health, Mercy Virtual, and Myia developed and owned LST's Confidential Information.

192.    These representations are material and have affected the conduct of prospective LST consumers (e.g., BJC), and are likely to affect the conduct of prospective LST consumers in the future.

193.    These representations have also caused, and are likely to continue causing, LST to lose business and harm LST's reputation or goodwill.

194.    Mercy Health, Mercy Virtual, and Myia continue to deceive prospective purchasers to the commercial detriment of LST.

195.    As a result, LST has suffered damages and will continue to suffer damages as a result of the aforementioned conduct.

196.    LST has suffered, and will continue to suffer, immediate and irreparable harm without any adequate remedy at law if Mercy Health, Mercy Virtual, and Myia are not enjoined from representing to customers that it owns, or otherwise independently developed, the Derivative Software without using LST's Confidential Information.

**COUNT 8: Tortious Interference With a Contract or Business Expectancy**
**Against Myia**
**(Missouri Common Law)**

197.     LST incorporates by reference all of the allegations in each of the preceding
paragraphs as if fully set forth herein.

198.     The Mutual NDA, SaaS Agreement, and PMSA Agreement constitute valid,
existing agreements between LST and Mercy.

199.     Myia willfully and intentionally interfered with the known contractual agreements
between LST and Mercy by: (A) actively encouraging Mercy to provide, and conspiring with
Mercy to receive and use on a continuing basis, Mercy's m.Care system User IDs and passwords
in violation of the agreements between LST and Mercy; (B) accessing LST's m.Care system
without authorization from LST on an ongoing and continual basis; and (C) developing a
competing software product derived from Myia's improper access of the m.Care system.  Myia
had knowledge of LST's contractual arrangement with Mercy.  Moreover, as a competing
software development company, Myia knew, or should have known, that LST would not provide
access to its proprietary software without entering into agreements with its customers, and that
such agreements would prohibit customers from providing access to the m.Care Software to third
parties.  As a result, even without the specific terms of LST's contracts with Mercy, Myia had
knowledge of such facts and circumstances that would lead a reasonable person to believe in the
existence of the contracts and terms between LST and Mercy.

200.     Myia's improper access to LST's m.Care software facilitated Myia's development
of its own competing software product.  Myia then used LST's trade secrets and Confidential
Information against LST to bid—and win—a contract for the provision of virtual patient care

36

services with BJC.  Without access to LST's system, Myia would not have been able to bid, and win, this contract for the provision of software services to BJC.

201.    As a direct and proximate result of Myia's aforementioned tortious acts, LST has been damaged in an amount to be determined at trial, including, but not limited to, lost revenue and investigative costs.  LST has incurred and will continue to incur additional damages and expenses, as well as attorneys' fees.

202.    LST has suffered, and will continue to suffer, immediate and irreparable harm without any adequate remedy at law if Myia is not enjoined.

WHEREFORE, LifeScience Technologies, LLC respectfully requests the Court to enter judgment for it and against Defendants as follows:

A.    Entering judgment in LST's favor and finding that:

a) Mercy Health and Mercy Virtual have breached one or more provisions of the Mutual NDA, SaaS Agreement, and PMSA Agreement;

b) Mercy Health, Mercy Virtual, and Myia have misappropriated LST's trade secrets in violation of the Defend Trade Secrets Act;

c) Mercy Health, Mercy Virtual, and Myia have misappropriated LST's trade secrets in violation of the Missouri Uniform Trade Secrets Act;

d) Mercy Health, Mercy Virtual, and Myia have violated the Missouri Computer Tampering Act, Mo. Rev. Stat. § 569.095 *et seq.;*

e) Mercy Health, Mercy Virtual, and Myia have been unjustly enriched through the disclosure, use, and misappropriation of LST's trade secrets and Confidential Information;

f) Mercy Health, Mercy Virtual, and Myia have engaged in a civil conspiracy to usurp LST's trade secrets and Confidential Information for the purposes of developing a competing software product and then negotiating an ownership stake for Mercy in said software product;

g) Mercy Health, Mercy Virtual, and Myia have unfairly competed by stealing LST's Confidential Information, repackaging it in the Derivative Software, and representing it as their own for purposes of securing new business with customers and potential customers and otherwise competing with LST;

h) Mercy Health, Mercy Virtual, and Myia have tortuously interfered with LST's agreements with Mercy Health/Mercy Virtual and business expectancy with BJC;

B.     Awarding LST its actual damages; lost profits; punitive damages or exemplary damages; amount of any unjust enrichment enjoyed by Defendants; loss in value to any LST trade secrets, Confidential Information, or other assets that were destroyed as a result of Defendants' conduct in amount to be proven at trial;

C.     Permanently enjoining Mercy Health, Mercy Virtual, and Myia to prevent the further actual and threatened misappropriation, and misuse, of LST's trade secrets and Confidential Information;

D.     Ordering the destruction of any software product that was developed with the assistance of, or otherwise incorporates, LST's trade secrets or Confidential Information;

E.     Finding that Defendants conduct was willful and egregious and award LST exemplary damages under the Defend Trade Secrets Act and/or the Missouri Uniform Trade Secret Act;

F.      Awarding LST its attorneys' fees under the Defend Trade Secrets Act, Missouri Uniform Trade Secret Act, or the provisions of the contracts between the parties;

G.      Awarding LST costs, prejudgment and post judgment interest; and

H.      Granting LST such other and further relief as the Court may deem just and proper in the circumstances.


Date: October 25, 2021                  Respectfully submitted,

                                        **STINSON LLP**

                                        */s/ B. Scott Eidson*
                                        B. Scott Eidson, #57757MO
                                        Jaclyn N. Warr, #59975MO
                                        Julie C. Scheipeter, #65978MO
                                        7700 Forsyth Blvd., Suite 1100
                                        St. Louis, MO 63105
                                        Telephone (314) 863-0800
                                        Facsimile (314) 863-9388
                                        scott.eidson@stinson.com
                                        nicci.warr@stinson.com
                                        julie.scheipeter@stinson.com

                                        Jeffrey J. Goulder, #10258AZ (*pro hac vice* forthcoming)
                                        Javier Torres, #217538AZ (*pro hac vice* pending)
                                        1850 North Central Ave., Suite 2100
                                        Phoenix, AZ  85004-4584
                                        Telephone (602) 279-1600
                                        Facsimile (602) 240-6925
                                        jeffrey.goulder@stinson.com
                                        javier.torres@stinson.com

                                        Judith S. Araujo, #54102CO (*pro hac vice* pending)
                                        1050 17th Street, Suite 2400
                                        Denver, CO  80265
                                        Telephone (720) 728-7650
                                        Facsimile (720) 728-7649
                                        juidth.araujo@stinson.com

                                        *Attorneys for Plaintiff LifeScience Technologies, LLC*