UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LIFESCIENCE TECHNOLOGIES, LLC ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 4:21-cv-01279-SEP |
| ) | |
| MERCY HEALTH, et al, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Before the Court are Defendants Mercy Health, Mercy ACO Clinical Services Inc., (collectively, Mercy) and Myia Labs, Inc.'s motions to dismiss. Docs. [35], [37]. For the reasons set forth below, Mercy's motion is denied, and Myia's motion is granted in part and denied in part.

**I.    FACTS AND BACKGROUND[1]**

This trade secret misappropriation case arises out of a dispute between Plaintiff, LifeScience Technologies, LLC (LST) and Defendants. LST is a software development company that develops and delivers virtual patient care solutions. Doc. [1] ¶ 19. One of LST's virtual care platforms is m.Care, which connects hospital-based teams with home-based patients. *Id*. ¶¶ 19, 22. The m.Care system is protected by confidentiality agreements and non-disclosure agreements with every health provider that utilizes the platform, and LST maintains certain features, functionality, interfaces, documentation, and know-how associated with the m.Care platform as company trade secrets. *Id*. ¶¶ 24-25.

In 2015, Mercy asked LST to further develop and expand its m.Care platform for use in its patient population. *Id*. ¶ 30. In furtherance of the joint endeavor, LifeScience and Mercy entered into multiple agreements relevant to this lawsuit, including a Mutual Nondisclosure Agreement (NDA), a Master Agreement for Software as a Service (SaaS), and a Professional Services Master Services Agreement (PMSA) (collectively, the "Agreements"). *Id*. ¶¶ 30, 32.

Sometime in 2018, while Mercy was using LST's m.Care platform, the Mercy leadership team announced to its employees that they were bringing Myia aboard to co-develop a virtual

---

[1] For purposes of the motions to dismiss, the Court takes the factual allegations in the Complaint, Doc. [1], to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

1

patient care platform for Mercy's use. *Id*. ¶ 57.  When Myia began working with Mercy, it did not have its own virtual care platform. *Id*. ¶ 59.  Plaintiff alleges that Mercy improperly allowed Myia employees to access the m.Care platform in order to examine, reverse engineer, and use LST's trade secrets and intellectual property to develop Myia's own derivative software product. *Id*. ¶¶ 60-77, 81.  The eventual Myia product has similar features and functionality to LST's m.Care software. *Id*. ¶ 79.  In 2019, while Myia was developing its product, Mercy acquired an ownership stake in Myia for $5,000,000.00. *Id*. ¶ 82.  Once Myia's derivative software was functionally capable of replacing LST"s m.Care software, Mercy stopped using m.Care and began using Myia's virtual care platform instead. *Id*. ¶ 86.

On October 25, 2021, Plaintiff filed this eight-count action, alleging breach of contract against Mercy, tortious interference against Myia, statutory violations of misappropriating trade secrets under the Defend Trade Secrets Act (DTSA) and the Missouri Uniform Trade Secrets Act (MUTSA) violations of the Missouri Computer Tampering Act, and state common law claims for unjust enrichment, civil conspiracy, and unfair competition against both Defendants.

Mercy now moves for dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, for a more definite statement under Rule 12(e).  Myia moves to dismiss under Rule 12(b)(6), and additionally moves to dismiss for improper service of process pursuant to Rules 12(b)(4) and (5).

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure Rule 12(b)(6), courts shall not dismiss any complaint that states a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint is plausible on its face when the pleaded facts allow the Court to reasonably infer that the defendant is liable. *Iqbal*, 556 U.S. at 678.  The Court views all facts and draws all reasonable inferences in favor of the nonmoving party. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2008).  The Court must accept the facts alleged as true, "even if doubtful." *Twombly*, 550 U.S. at 555.  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Id*. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

### III. DISCUSSION

#### A. Breach of Contract Claim Against Mercy

Under Missouri law, a party claiming breach of contract must show (1) the existence of a valid contract; (2) the rights of plaintiff and obligations of defendant under the contract; (3) a breach by defendant under the contract; and (4) damages resulting from the breach. *Clayborne v. Enter. Leasing Co. of St. Louis, LLC*, 524 S.W.3d 101, 106 (Mo. Ct. App. 2017). Plaintiff claims that Mercy violated certain provisions in the NDA, the SaaS, and the PMSA by covertly allowing Myia improper access to the m.Care system, and enabling Myia to obtain and use LST's trade secrets and confidential information. Mercy asserts that LST has not sufficiently pleaded that Mercy breached the Agreements, as the Agreements expressly permit Mercy to do all actions alleged by LST. *See* Doc. [36] at 11-13.

More specifically, Mercy argues that there was no breach because LST "only alleges that Myia accessed the m.Care platform or software as Mercy ordinarily uses the product" (in other words, in ways that both Mercy and its third-party contractors were expressly permitted to do under the Agreements), and that all information accessed by Myia was "Mercy owned data, workflow, and patient-related content." Doc. [36] at 11. In support of its argument, Mercy cites the following sections of the Agreements: § 3.3.3 of the SaaS, which states that "Mercy owns and shall retain ownership of the content and workflow methods that are developed to be used with the Services"; § 10.4 of the SaaS, which states that "[a]ll data collected by Mercy from an LST user's submission of data to Mercy via the LST Software . . . will be and remain . . . the property of Mercy"; § 1.2 of the PMSA, which defines Mercy's "Customer Background Intellectual Property" as including "all technologies, software products, algorithms, formulas, techniques, routines, methodologies, processes, libraries, tools, know-how, and other intellectual property" owned or licensed to Mercy prior to July 1, 2018; § 4.2 of the PMSA, stating that "[Mercy] owns and shall retain ownership of the content, including but limited to, all clinical triage algorithms, decision support methods, data presentation methods, clinical data collected, and clinical workflow processes, branding, and messaging that are developed to be used with the Services"; § 12.2 of the PMSA, stating that "[Mercy] is and shall remain the owner of all right, title and interest in and to all information and data, to the extent attained or developed by [LST] from or on behalf of [Mercy], and all information and data derived from such information or data"; § 3.2 of the SaaS, which allows Mercy to grant access to "third parties to perform . . .

3

other services for Mercy"; § 13 of the SaaS, which permits Mercy to grant access to "outsourcers, subcontractors, consultants, or other third parties" to "perform services or provide products . . . relating to Mercy's businesses"; and finally, § 12.1 of the PMSA, which states that "nothing in this PMSA is intended to impair [Mercy's] right to develop, make, use, produce, market or sell any products or services that may be competitive with and similar to [LST]'s products." Mercy argues that the cited provisions demonstrate that "much of the information and processes accessible through the [m.Care] platform belonged to, were licensed to, and/or could be accessed by Mercy and its contractors," and accordingly, LST has failed to state a claim for breach of contract. Docs. [52] at 5-6; [68] *passim*; [69] *passim*.

Mercy essentially argues that the text of the Agreements forecloses LST's breach of contract claim against Mercy, because the Agreements establish that Mercy owns "much" of the information and work product addressed in the agreements and that it has broad authorization to use and share the same. *Id*.

Upon examination of the provisions cited, there is no doubt that the Agreements grant significant ownership and usage rights to Mercy with respect to the services and information provided by LST. But there is likewise no doubt that the Agreements recognize that LST retains ownership of LST property, trade secrets, and confidential information, and restrict in various ways Mercy's ability to use or share the same. For example, § 3.3.1 of the SaaS states that "LST owns all right, title and interest in and to the LST Property, and nothing in this Agreement conveys any such ownership to Mercy." Doc. [68] at 5. Section 8.2 of the SaaS states that "Mercy shall not modify, adapt, translate, reverse engineer, decompile, disassemble, or create derivative works based on the LST Property . . . without the prior written consent of LST." *Id*. at 8. LST also directs the Court's attention to the PMSA, which states, in § 12.1, that the parties "shall not disclose such other Party's . . . Confidential Information to any contractor or other third party or any employee or advisor without a need to have access to the Confidential Information, without prior, written approval." Doc. [69] at 13. That same section goes on to state that a party's confidential information may only be used "to the extent reasonably required for the purpose of performance of its obligations under this Agreement." *Id*. Additionally, § 4.4 of the PMSA states that work performed by LST is not considered a "work for hire," and is the "sole property" of LST "free and clear from all claims of any nature relating to Mercy's contributions." *Id*. at 7. Finally, § 4.8 of the PMSA states that Mercy "shall not, and shall not

4

authorize any third party to: (i) translate, reverse engineer, decompile, disassemble, or attempt to derive the source code of any [LST] software provided to [Mercy]." *Id*. at 8.

Furthermore, many of the provisions quoted in Mercy's briefing paint a murkier picture of the parties' respective rights when read in full. For example, § 1.2 of the PMSA does state that Mercy's "Customer Background Intellectual Property" includes "all technologies, software products, algorithms, formulas, techniques, routines, methodologies, processes, libraries, tools, know-how, and other intellectual property," but, as the section goes on to state, only so long as Mercy "does not use or infringe a [LST] Intellectual Property Right." Doc. [69] at 3. Similarly, § 3.2 of the SaaS grants Mercy the right to "permit use of the Services and Software by one or more third Parties." Doc. [68] at 5. However, that same section also states that "Mercy must require such third-party contractors "to enter into confidentiality agreements to protect the LST Property." *Id*. Additionally, § 13 of the SaaS permits Mercy to grant access to "outsourcers, subcontractors, consultants, or other third parties" to "perform services or provide products . . . relating to Mercy's businesses." Doc. [68] at 10. However, that section goes on to state that such work "must be related to the Services,"[2] and that "LST may limit access to its Confidential Information and Intellectual Property to Mercy Third Party Contractors . . . [and] Mercy shall require all Third-Party Contractors to protect and keep confidential the LST Property to the same standards that Mercy is required to do so." *Id*.

Finally, it is not the case, as Mercy asserts, that LST has alleged only that Myia accessed the m.Care platform in ways that Mercy and its third-party contractors were expressly permitted to do under the Agreements. *See* Doc. [36] at 11. To the contrary, LST alleges that Mercy, without prior written approval from LST, gave Myia access to LST's trade secrets and confidential information, without requiring Myia to keep such information confidential, and that such improper access allowed Myia to reverse engineer, study, and create a derivative software platform based on LST's software and confidential information. *See* Doc. [1] ¶¶ 51, 61, 88, 89. The Agreements do not authorize such activities.

Plaintiff adequately pleads a breach of contract claim against Mercy. Whether Plaintiff will ultimately prevail based on the contract provisions at issue in the NDA, PMSA, and SaaS is

---

[2] "Services" is defined in § 2.15 of the SaaS as including "any Software and Deliverables" provided by LST. Doc. 3-2 at 4.

a question of fact not suitable for the Court to decide at the motion to dismiss stage. Mercy's motion to dismiss the breach of contract claim in Count I is denied.

### B. Misappropriation of Trade Secrets Against Mercy and Myia

In two separate counts, LST alleges that Mercy has misappropriated its trade secrets by intentionally giving Myia access to them for purposes of reverse engineering and developing a competing software, and that Myia has misappropriated LST's trade secrets by accessing, reviewing, and incorporating them into its derivative software, in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b)(1), and the Missouri Uniform Trade Secrets Act (MUTSA), Mo. Rev. Stat § 417.455.

To state a claim for misappropriation of a trade secret under the DTSA, a plaintiff must show that "the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DSTA defines a trade secret broadly as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if – (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Under the DTSA, a misappropriation may occur in any of three ways: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent. 18 U.S.C. § 1839(5).

To state a claim under the MUTSA, a plaintiff must demonstrate (1) the existence of protectable trade secrets, (2) misappropriation of those trade secrets by the defendant, and (3) damages. Mo. Rev. Stat § 417.453(2). The MUTSA defines a "trade secret" as:

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being

6

>generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MO. REV. STAT. § 417.453(4). The existence of a trade secret is a conclusion of law based on the applicable facts. *Lyn–Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo. Ct. App. 1999).

Because the elements of LST's trade secret misappropriation claims under the DTSA and MUTSA are essentially the same, and the arguments presented by Mercy and Myia are identical,[3] the Court considers the claims together. As further described below, the Court concludes that the allegations in Counts II and III contain sufficient detail to satisfy federal pleading standards.

Defendants argue that LST has failed to identify its trade secrets with sufficient particularity, and because of that, Defendants are left unable to ascertain what trade secrets are the subject of the Complaint, and therefore, unable to craft a defense. Doc. [36] at 14. Defendants cite several cases from outside this district (and outside this federal circuit) to support their assertion that Plaintiff must describe its alleged trade secrets in greater detail in order to state a claim. *See e.g., Navigation Holdings, LLC v. Molavi*, 445 F.Supp.3d 69, 75 (N.D. Cal. 2020) (plaintiff must describe trade secrets with particularity); *Decurtis LLC v. Carnival Corp.*, 2021 WL 1968327, at *6 (S.D. Fla. Jan. 6, 2021), report and recommendation adopted as modified, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021 (categorical descriptions such as "software," "prototypes," and "operations," are not sufficient to describe which trade secrets were misappropriated); *WeInfuse, LLC v. InfuseFlow*, LLC, 2021 WL 1165132, at *3 (N.D. Tex. Mar. 26, 2021) (plaintiff failed to specify the unique capabilities of the software alleged to be a trade secret).

Plaintiff argues, and the Court agrees, that it need not be held to a high degree of specificity in pleading its trade secrets. Courts in this district have consistently held that a "trade secret may be alleged broadly, as there is no specific requirement for particularity of trade secret allegations during the pleading stage." *Design Nine, Inc. v. Arch Rail Group, LLC*, 2019 WL 1326677, at *4 (E.D. Mo. Mar. 25, 2019). *See e.g.*, *Roeslein & Assocs., Inc. v. Elgin*, 2018 WL

---

[3] *See* Doc. [38] at 11-12 (Myia "incorporates and adopts by reference the more detailed arguments for dismissal of Counts 2 through 7 as set out in Mercy's Memorandum in Support of its Motion to Dismiss.").

7

1138465, at *9 (E.D. Mo. Mar. 2, 2018) ("None of the cases from within the Eighth Circuit expressly delineate a particularity requirement for the pleading stage of a trade secrets case . . . [and] it would be more prudent to wait until the summary judgment stage to evaluate the sufficiency of the particularity of Plaintiff's claimed trade secrets."); *Revolution FMO, LLC v. Mitchell,* 2018 WL 2163651, at *5, (E.D. Mo. May 10, 2018) (trade secrets described as "documents containing secrets . . . [such as] business methods, training materials, manuals and forms" provide "sufficient notice of the types of trade secrets involved. . . . [q]uestions about the particular trade secrets and documents at issue can be resolved in discovery."); *EnviroPAK Corp. v. Zenfinity Capital, LLC*, 2015 WL 331807, at *4 (E.D. Mo. Jan. 23, 2015) (complaint sufficiently stated described trade secrets where it alleged merely that it used confidential processes in making its products).

       Here, Plaintiff has alleged that it "maintains certain features, functionality, interfaces, documentation, and know-how associated with the m.Care platform as trade secrets" (Doc. [1] ¶ 24); and that the LST trade secrets "include, but are not limited to, information in the source code, object code, and executable programs of the m.Care software, the designs, schematics, documentation, logic, know how, negative know how, logic flow for the m.Care system, and certain program capabilities of the m.Care system." (*Id*. ¶¶ 148, 159).  This is sufficient to satisfy the pleading standard at this stage of the litigation.  To require greater specificity would run the risk of ignoring "the challenges a trade secret plaintiff commonly faces when only discovery will reveal exactly what the defendants are up to."  *Oakwood Lab., LLC v. Thanoo*, 999 F.3d 892, 907 (3rd Cir. 2021).  "If the trade secret plaintiff is forced to identify the trade secrets at issue without knowing which of those secrets have been misappropriated, it is placed in somewhat of a "Catch-22": Satisfying the requirement of detailed disclosure of the trade secrets without knowledge [of] what the defendant is doing can be very difficult.  If the list is too general, it will encompass material that the defendant will be able to show cannot be a trade secret.  If instead it is too specific, it may miss what the defendant is doing."  *Id*. (citing *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676. 680 (N.D. Ga. 2007).  "More specific factual determinations regarding any alleged trade secret 'is premature at this point' and more appropriate for the summary judgment stage." *Design Nine*, 2019 WL 1326677, at *4 (quoting *Roeslein & Assocs., Inc. v. Elgin*, 2018 WL 1138465, at *9 (E.D. Mo. Mar. 2, 2018).  Any further particularity Defendants seek

regarding Plaintiff's trade secret information may be addressed through the discovery process in this litigation and ultimately challenged at the summary judgment stage of this case.

Defendants also argue that because the Agreements establish that Mercy owns and is allowed to use much of the information related to the m.Care platform, LST cannot adequately allege that Defendants improperly took, disclosed, or used this information in a way that violated the DTSA or MUTSA. Doc. [36] at 16. That is nothing more than a reprise of Mercy's argument in opposition to the breach of contract claim in Count I, and the argument fails for the same reasons discussed above.

Accordingly, the Court declines to dismiss Counts II and III.

### C.  Missouri Computer Tampering Act

The Missouri Computer Tampering Act (MCTA) provides a civil cause of action to the owner or lessee of electronically stored data that is improperly accessed. MO. REV. STAT. § 537.525. A violation under the MCTA occurs when a person "knowingly and without authorization ... discloses or takes data ... residing or existing internal or external to a computer, computer system, or computer network; or . . . receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection." *Anzaldua v. NE Ambulance & Fire Prot. Dist.,* 793 F.3d 822, 843 (8th Cir. 2015). The claim does not depend on whether the items or information tampered with are alleged to be trade secrets. *Design Nine*, 2019 WL 1326677, at *5.

Defendants argue that Plaintiff's MCTA claim is insufficient under Rule 12(b)(6) because LST did not adequately allege that it is the owner or lessee of the computer system, network, program, service, or data it alleges to have been modified, disclosed, or used in violation of the MCTA. *See* Doc. [36] at 18. Defendants also argue that LST's MCTA claim must fail because LST cannot plausibly allege that Defendants engaged in any unauthorized modification or disclosure of the information at issue. Both arguments are again based on the premise that the Agreements granted Mercy ownership and power to access and use much of the information related to and accessed through m.Care, and therefore Defendants could not have accessed or used the information without authorization. The Court has already explained why that argument fails at this stage of the proceedings and will not revisit the issue.

Plaintiff's Complaint plainly alleges that m.Care belongs to LST and that Mercy and Myia inappropriately accessed that system, without authorization, for the prohibited purpose of

9

creating a competing derivative software system.  *See* Doc. [1] ¶¶ 19, 23-15, 52, 89, 170-175. That is all that is required to state a claim under the MCTA, and the Court will not dismiss Count IV of the Complaint.

### D. Common Law Claims for Unjust Enrichment, Conspiracy, and Unfair Competition

Plaintiff brings three common law claims against both Mercy and Myia, including one for unjust enrichment in Count V, civil conspiracy in Count VI, and unfair competition in Count VII. Defendants argue that MUTSA preempts LST's Missouri common law claims, as those claims are nothing more than restatements of its claims under MUTSA.  Myia separately argues that LST"s claim against it for unjust enrichment in Count V must fail for failure to plead essential elements as to Myia.

Generally, MUTSA does "displace conflicting tort, restitutionary, and other laws . . . providing civil remedies for misappropriation of a trade secret." MO. REV. STAT. § 417.463.1. Federal courts have held that this provision preempts "civil claim[s] that are derivative of a claim of misappropriation of trade secrets[.]" *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 2002 WL 32727076, at *4 (E.D. Mo. Feb. 25, 2002). *See also Pinebrook Holdings, LLC v. Narup*, 2020 WL 871578, at *8 (E.D. Mo. Feb. 21, 2020) (MUTSA preempts common-law claims as derivative "if they are based on facts related to the misappropriation of trade secrets claim."). A claim based on facts that are independent of the trade secret claim is not preempted.

At this stage in the litigation, it would be premature to dismiss LST's claims based on preemption.  "[D]etermining whether something is a trade secret is a matter of law, and that legal determination must be based on evidence showing that the claimed secrets meet the statutory definitions." *Design Nine,* 2019 WL 1326677, at *5; *see also Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 757 F. Supp. 2d 904, 917 (W.D. Mo. 2010) (MUTSA preemption requires the stolen/misappropriated information to be a trade secret).  This Court has not yet determined whether, as a matter of law, the underlying information at issue in the case may legally qualify as trade secrets.  If LST proves its allegations that the information at issue is in fact a protected trade secret, then the common law claims that are based on the same facts would be preempted.  But until that legal determination is made, it would be premature to find that MUTSA preempts Plaintiff's state law claims.  *See EnviroPAK*, 2015 WL 331807 at *6 ("As a practical matter, until this Court is able to make a determination as to whether the

information . . . qualifies as a trade secret, the Court cannot rule on the precise extent" of preemption.).

As noted above, Myia also argues that Count V for Unjust Enrichment must be dismissed for failure to state a claim against it. Myia argues that the claim requires a "quasi-contractual" relationship between a plaintiff and defendant, and such a relationship is absent here. Doc. [38] at 14. The Court agrees.

"The elements of unjust enrichment are: "a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of the benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Bauer Dev. LLC v. BOK Fin. Corp.,* 290 S.W.3d 96, 100 (Mo. Ct. App. 2009) (citing *Hertz Corp. v. RAKS Hospitality, Inc.,* 196 S.W.3d 536, 543 (Mo. Ct. App. 2006)). Unjust enrichment claims arise out of contract law and are based on a legal fiction that provides a means of recovery where parties do not have an express contract. *United States v. Applied Pharm. Consultants, Inc.,* 182 F.3d 603, 606 (8th Cir.1999). "Thus, it is the contract-like nature of the relationship between the parties that gives rise to unjust enrichment claims." *Wiles v. Worldwide Info., Inc*., 809 F. Supp. 2d 1059, 1083 (W.D. Mo. 2011). Additionally, the Missouri Supreme Court has held that to state a claim for unjust enrichment, a plaintiff must allege that a benefit was conferred on the defendant by that particular plaintiff. *Am. Civil Liberties Union/E. Mo. Fund v. Miller,* 803 S.W.2d 592, 595 (Mo. 1991) (en banc).

Plaintiff's allegations indicate no such quasi-contractual relationship between the parties. Additionally, any benefit enjoyed by Myia was conferred by Mercy, not LST. Accordingly, the Court grants the motion to dismiss Count V as brought against Myia but denies the motion to dismiss Count V against Mercy. The Court also denies the motion to dismiss Counts VI and VII against both Defendants.

### E. Tortious Interference with a Contract or Business Expectancy

Plaintiff brings a Missouri common law claim for tortious interference with a contract or business expectancy against Myia. Myia argues that the claim is preempted by MUTSA[4] and that LST fails to plead essential elements of the claim.

---

[4] For the reasons stated above, Myia's argument that the claim for tortious interference is preempted under MUTSA is premature at this stage of the proceedings.

To state a claim for tortious interference with a contract or business expectancy, a plaintiff must allege the following elements: "(1) a contract or a valid business expectancy; (2) A defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct." *US Polymers-Accurez, LLC v. Kane Int'l Corp.*, 2018 WL 4491168, at *3 (E.D. Mo. Sept. 19, 2018) (quoting *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990) (en banc)). "Under Missouri law, no liability arises for interfering with a contract or business expectancy if the action complained of was an act that the defendant had a definite legal right to do without any qualification." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 614 (Mo. banc. 2006).

Myia asserts that it has never seen the Mercy-LST contracts with which Myia allegedly tortiously interfered, and has not read the specific confidentiality provisions that LST alleges Myia caused Mercy to breach. Because of this, Myia argues that LST has not adequately plead that Myia had knowledge of the contracts or relationship. LST counters that Myia is essentially arguing for a heightened pleading requirement with respect to this element of the claim. The Court agrees. Myia has cited no authority supporting the contention that a tortious interference defendant must not only have knowledge that a contract or relationship existed but must also have seen the specific terms or provisions of the contract or relationship. It is enough to plead that Myia knew of the Agreements or business relationship, and the Complaint adequately alleges such knowledge here. *See* Doc. [1] ¶¶ 198-99.

Myia also argues that LST has failed to allege that Myia intentionally interfered with any contract or business expectancy between LST and Mercy. Though this is a closer question, the Court concludes that LST has adequately pleaded this element of the claim. LST alleges that Myia wished to learn about LST's "proprietary and confidential" m.Care platform; that Mercy, in order to further Myia's goal of accessing and using LST's confidential information, granted Myia access to LST's trade secrets by giving them Mercy login credentials which were not readily detectable to LST; that Myia personnel accessed the m.Care platform using Mercy login credentials; and that Myia used the information it gathered from such access to design its own derivative virtual patient software. *See* Doc. [1] ¶¶ 60, 61, 63, 64, 77. The Court must draw all reasonable inferences in favor of the nonmoving party, *Waters v. Madson*, 921 F.3d 725, 734

(8th Cir. 2008), and it can be fairly inferred from the allegations that Myia intentionally interfered with LST's contract or relationship with Mercy.

Finally, Myia argues that LST has failed to plead that Myia's interference was without justification, as LST does not allege that Myia employed any "improper means" to accomplish the alleged interference. Doc. [38] at 21 (citing *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. banc 1993)). *Nazeri* held that to show absence of justification, a tortious interference plaintiff must show that the defendant employed "improper means" in seeking to further its own interests, including methods that "are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, *or any other wrongful act recognized by statute or the common law*." *Id*. (emphasis added). The Complaint alleges multiple actions by Myia that are recognized as wrongful under "statute or the common law," including trade secret misappropriation under DTSA and MUTSA, violation of the Missouri Computer Tampering Act, and unfair competition. The Court concludes that LST has adequately pleaded an absence of justification and denies Myia's motion to dismiss Count VIII.

### F. Sufficiency of Process or Service

Myia moves for the Complaint to be dismissed in its entirety for insufficient service of process on Myia under Federal Rules of Civil Procedure 10(c), 12(b)(4) and 12(b)(5). Myia argues that service of the Complaint was defective because the exhibits to the Complaint (the Agreements) were not attached at the time of service. Under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Rule 4(c)(1), in turn, requires service of "a copy of the complaint." Fed. R. Civ. P. 4(c)(1). Interpreting these rules together, Myia argues that because the Agreements were not attached to the complaint, LST failed to serve the complete pleading, and therefore, service was improper. LST argues that it offered to serve the exhibits on Myia's counsel but wished to restrict them to "Attorneys' Eyes Only" status, as the Agreements contained commercially sensitive information, but Myia refused to accept the exhibits under such restriction.

The Court notes that federal law does not require a plaintiff to attach to his complaint the contract he is suing upon. *See* 5A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1327 (4th ed.) ("The provision for incorporation of exhibits in Rule 10(c) is permissive only, and there is no requirement that the pleader attach a copy of the writing on which his claim for relief or defense is based."). In any event, in the time since Myia's Motion

to Dismiss was fully briefed, developments in the instant litigation have rendered this issue moot. Myia asserts in its briefing that it was always willing to accept service of the exhibits with the commercially sensitive terms redacted. *See* Doc. [54] at 10. On April 28, 2022, LST moved to file the Agreements under seal (Doc. [66]), and on that same date filed on the public docket copies of the Agreements with redactions of all commercially sensitive information. *See* Docs. [68], [69]. Therefore, copies of the Agreements have been available to Myia under conditions expressly acceptable to it for several months now. Accordingly, Myia's motion to dismiss for insufficient service of process is denied.

### G. Motion for a More Definite Statement

If its motion to dismiss is not granted, Mercy asks for a more definite statement on the grounds that the Complaint is so vague that it cannot reasonably prepare a response.

Federal Rule of Civil Procedure 12(e) provides that a party may move for a more definite statement if "a pleading . . . is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). "Rule 12(e) provides a remedy for unintelligible pleadings, it is not intended to correct a claimed lack of detail." *The Revolution FMO, LLC v. Mitchell*, 2018 WL 2163651, at *6 (E.D. Mo. May 10, 2018). LST's Complaint is not unintelligible, and Mercy can be reasonably expected to frame a response. The motion for a more definite statement is denied

### IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Mercy's Motion to Dismiss (Doc. [35]) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Myia's Motion to Dismiss (Doc. [37]) is **GRANTED** in part and **DENIED** in part as set forth above.

Dated this 29th day of September, 2022.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE