1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MISSOURI
2

3    LIFESCIENCE TECHNOLOGIES, LLC

          Plaintiff,
4

          vs.              Cause No. 4:21-CV-01279 SEP
5

6    MERCY HEALTH, et al.,

          Defendants.
7    ========================================================
                 TRANSCRIPT OF MOTION HEARING
8                  Via Zoom Videoconference
             BEFORE THE HONORABLE SARAH E. PITLYK
9                UNITED STATES DISTRICT JUDGE
                    NOVEMBER 20, 2023
10   ========================================================
                       APPEARANCES
11

12   FOR PLAINTIFF:

13   Mr. B. Scott Edison
     Ms. J. Nicci Warr
     STINSON, LLP
14   7700 Forsyth, Suite 1100
     St. Louis, MO 63105
15

16   FOR DEFENDANT MERCY HEALTH:

17   Mr. Mark S. Deiermann
     Mr. Jason Scott Meyer
     Mr. Craig S. O'Dear
18   Mr. David A. Roodman
     BRYAN CAVE, LLP - St. Louis
19   One Metropolitan Square
     211 N. Broadway, Suite 3600
20   St. Louis, MO 63102

21   Appearances Continued on the Next Page

22                    Reported by:

23        Alison M. Garagnani, CCR #475, CSR, RMR
                Official Court Reporter
24           United States District Court
           555 Independence, Room 3100
25            Cape Girardeau, MO 63703
                   (573) 331-8832

1

        APPEARANCES CONTINUED

2

3   FOR DEFENDANT MYIA LABS, INC.:

4   Mr. Jeffrey R. Hoops
    Ms. Michelle Nasser
5   DOWD BENNETT, LLP - St. Louis
    7676 Forsyth Boulevard
6   Suite 1900
    St. Louis, MO 63105
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (THE PROCEEDINGS BEGAN AT 1:39 P.M.)

2     (THE FOLLOWING PROCEEDINGS WERE HELD VIA ZOOM

3     VIDEOCONFERENCE:)

4          THE COURT:  Good afternoon.  Can everyone

5     here hear me?

6          MR. DEIERMANN:  Yes, Your Honor.

7          MS. WARR:  Yes, Your Honor.

8          THE COURT:  Great.  We are here in

9     LifeSciences Technology v. Mercy.

10         I'm sorry for being a little bit late.  I was

11    alerted at about two minutes to 1:00  that you-all had

12    filed another one of these an hour ago, and so I

13    thought I would review it quickly to see if we can at

14    least start the conversation on the other shoe today.

15         Then I know you-all are busy.  We're all

16    about to get busier because it's November and December.

17    And I'll just tell you my docket is not very open to

18    additional hearings next month.  So let's talk about

19    what we can talk about today and see what we can do to

20    get you guys moving forward.

21         Okay.   I have a joint motion about

22    litigation funding information.   And I have read your

23    motion.

24         And I've read the -- and reviewed the case

25    file.  And I'll say that my general understanding of

1    the lay of the land is that discovery of this kind of

2    information is disfavored except in very specific

3    circumstances it may or may not obtain.  And so I want

4    to go right to whether some of those circumstances do

5    obtain here.

6         I have kind of a quick litany such as the

7    nature of the three-page motion.  So I'm not faulting

8    you for writing it quickly.  But I would need to know

9    more about the bases, sort of facts about this case

10   that the -- that I think it's -- sorry -- Defendants

11   generally believe make this a case in which it would be

12   appropriate to have that information.

13        So why don't we start there.  Who wants to

14   speak?

15        MR. DEIERMANN:  Your Honor, this is Mark

16   Deiermann.  I'm with Bryan Cave on behalf of the

17   Defendants Mercy.

18        THE COURT:  Uh-huh.

19        MR. DEIERMANN:  I'm happy to take the lead,

20   and we'll see where it goes from here.

21        THE COURT:  Okay.  Great.  Thank you.

22        MR. DEIERMANN:  So, Your Honor, the comment

23   was that this sort of discovery pertaining to

24   litigation funding is disfavored except in certain

25   circumstances.  So why don't I begin by just talking

1   about the relevance because I suspect that's one of

2   your questions.

3            THE COURT:  Yes.

4            MR. DEIERMANN:  The information that we're

5   seeking is relevant in a number of respects.  As a

6   matter of fact, the reason that we attached the

7   deposition excerpts was to try to provide some sort of

8   color or background as to what we were going for and

9   the reasons we were seeking the information.  Let me

10  be more precise since we have a little bit more time

11  now.

12           THE COURT:  Thank you.

13           MR. DEIERMANN:  The information that we're

14  seeking is relevant in a number of respects.  First of

15  all, kind of the most obvious one is that LST is

16  seeking attorneys' fees under the -- a couple of the

17  agreements between Mercy and LST.

18           They claim that there's an attorneys' fee

19  provision in the mutual NDA, that that provision is

20  also incorporated in the one or more of the other

21  agreements between Mercy and LST.

22           What they don't really mention, though, is

23  that there is a provision in the mutual NDA, which,

24  again, would be incorporated into the other agreement

25  to the extent that its incorporated, which severely

1    limits the assignability of any rights under the

2    agreement.

3            From our perspective that would include any

4    rights to recover attorneys' fees.  And to the extent

5    that there has been any kind of effective assignment of

6    the right to recover attorneys' fees that's directly

7    relevant for purposes of the litigation.  We need to

8    know whether or not Legalist, the litigation funder, is

9    picking up the tab for legal fees, because that may

10   very well effectively be a breach of the underlying

11   mutual NDA and then any agreement into which that's

12   incorporated as it relates to LST's alleged ability to

13   recover attorneys' fees.  So that's point number one.

14           On the relate --

15           THE COURT:  Let me stop you right there and

16   ask a couple of questions.  That's already a very

17   complicated point.

18           Surely -- and I say that so often and so

19   often it turns out not to be the case.  Surely that

20   situation exists in a lot of litigation where this

21   episode that the contract with the litigation funder

22   may affect the amount of attorneys' fees if the

23   relationship is direct as you're saying.

24           Is that not true?

25           MR. DEIERMANN:  It's a contract with the

1   litigation.   Your Honor, I haven't seen cases dealing

2   with that issue.  I've read a number of cases, as you

3   can imagine, getting ready for today.   I haven't seen

4   that specific issue dealt with in the litigation

5   funding context.

6          From Mercy's perspective let me just kind of

7   give the big picture here.  The big picture is in the

8   mutual NDA and the other related agreements Mercy was

9   negotiating with LST.   And LST -- I don't want to say

10  it was a start-up, but obviously LST was relatively

11  small and was negotiating an agreement with the

12  litigation funder.

13         And so to the extent that there's any sort of

14  agreement with respect to the circumstances under which

15  legal fees will be paid the last thing in the world

16  that Mercy ever agreed to do, much less was ever

17  contemplated doing, was agreeing to an attorneys' fee

18  provision in a matter where on the other side you had a

19  litigation funder whose basic function is to roll the

20  dice and see what kind of recovery they can get.

21         So in terms of your specific question was can

22  I give you a case on point because obviously there must

23  be a lot of those out there.   I've read a lot of

24  cases.  I have not seen that specific issue mainly

25  whether or not someone such as LST reaching an

1    agreement with the litigation funder violates the terms

2    of a contractual attorneys' fee provision such that

3    they have no right to assign legal fees -- the

4    recoverability of legal fees to the litigation funder.

5           THE COURT:  Okay.  Let's say that I grant

6    that that is relevant information to the attorney fees

7    question.  What would be relevant there?  Just the

8    whether or not there was an assignment provision or

9    some limitation on assignment?

10          MR. DEIERMANN:  I think the questions would

11   be the extent to which the right to recover attorneys'

12   fees have effectively been assigned.  So I can't say

13   it's limited to the amount of the attorneys' fees, but

14   it's going to focus on the attorneys' fees issues.

15   That's correct, Your Honor.

16          THE COURT:  Okay.  Let me hear from Plaintiff

17   on that particular question.

18          MS. WARR:  Yes, Your Honor.  This is Nicci

19   Warr representing the Plaintiffs.

20          I think it is notable that the Defendants

21   have not been able to offer any case law to support

22   their theory that an attorneys' fees provision in a

23   contract would somehow make a litigation funding

24   agreement relevant to the case.

25          The truth is that attorneys' fees are

1    available through a number of different mechanisms in

2    this case and many other cases that involve litigation

3    funding.   I'm not aware and Defendants haven't

4    presented a case where a court has said that an issue

5    related to attorneys' fees somehow makes litigation

6    funding relevant to the overall case.

7         The fact is is that the argument that a

8    litigation funding agreement is somehow an assignment

9    of an underlying contractual agreement is not legally

10   supported.   There's no case law that would support

11   that.

12        And, in effect, what Mercy appears to be

13   arguing for is some type of right and limitation to

14   prevent LST from being able to fund a litigation

15   against Mercy in order to protect its rights and

16   recover for the breach of contract by -- through an

17   argument that it essentially has a power over LST's

18   right to do that through the underlying agreement,

19   through the non-assignment contract.

20        I don't think that's the law.   I think

21   that's bad policy.   There's no case law supporting it.

22   It would essentially give Mercy the right to deny LST

23   its ability to come into court for breach of the

24   contract that Mercy caused.

25             THE COURT:  Okay.  I'm going to stop you both

1    right there and say that this is not a thing that I

2    will decide today on a phone call, so essentially

3    without the support of any case law.

4         So if this is going to be the bases for the

5    discoverability of anything, despite the sort of

6    general presumption against litigation funding, it's

7    going to need to be spelled out in a motion to compel

8    with case support, because, while this precise issue

9    may not have been raised in a lawsuit before, that

10   could be a sign that it's very far outside the overtone

11   window of -- for this topic, and that's not something I

12   have any concept of right now.  And so I will need to

13   see both sides' positions on this.

14        I would encourage you not to brief it if it's

15   a nonstarter once you've researched the case law a

16   little bit more thoroughly.  But if you think there's

17   something there, then please find me -- if it's not a

18   case on point, then make the argument as well as you

19   can on paper because it's going to take that in order

20   for me to step out on that limb.

21        Okay.  So but please go to the other bases

22   for the discoverability of litigation funding here.

23        MR. DEIERMANN:  Sure.  Your Honor, first

24   there have been suggestions throughout the litigation,

25   including in the Complaint, that this is the "David v.

1    Goliath" scenario.

2         THE COURT:  Okay.

3         MR. DEIERMANN:   Yeah.  I can refer you to

4    various allegations in the Complaint where that's

5    suggested.

6         THE COURT:  I take your word for it.   Go

7    ahead.

8         MR. DEIERMANN:  All right.  And we think that

9    the presence of litigation funder relates directly to

10   that.

11        This is not a big guy Mercy against a little

12   guy LST.   LST is being presumably financed by

13   Legalist, which is a very substantial entity.  I can't

14   tell you if they're 500 million, 900 million, a

15   billion, or whatever.  But they're a substantial

16   entity.  It goes directly to diffusing the "David v.

17   Goliath" scenario.

18        THE COURT:  Okay.  Has that argument been

19   successful in persuading another court to allow more

20   than just the facts of litigation funding to be

21   discussed?

22        So you already know there's litigation

23   funding.  You already know it's by a company that's

24   worth however many hundreds of millions of dollars.  In

25   the event that I find that that's admissible

1    information in the context of the trial, you already

2    have it.

3              So what more would you need to sort of fight

4    that "David and Goliath" scenario?

5              MR. DEIERMANN:  I think the -- the terms and

6    conditions with respect to the funding -- and really,

7    Your Honor, I kind of have to segregate this because

8    this really ties into a second issue, which is the

9    motivation for the lawsuit, which in turn ties

10   specifically into the abuse-of-process claim.

11             THE COURT:  Okay.

12             MR. DEIERMANN:  One of the arguments not only

13   of us but also of Myia is that LST's real purpose in

14   filing this lawsuit isn't to protect its trade secrets,

15   rather it's to drive Myia out of business.

16             And so the fact that they've got a litigation

17   funder who's financing this to the tune of X amount of

18   dollars is going to be significant.  The approach

19   they're taking in this lawsuit seems to be designed, A,

20   to make things as expensive as possible, which in turn,

21   B, effectively, along with the press release and some

22   other things, is going to probably drive Myia out of

23   business.  I mean, we've been talking about this for a

24   substantial period of time.

25             So I think that when you look at it in terms

1   of how this is relevant and you talk about "David v.

2   Goliath," you also have to take into account the key

3   question of what is motivating litigation, what has

4   motivated it, and the abuse-of-process claim.

5          This ties into one other issue.  And I

6   apologize for kind of mixing the issues up here, but

7   they are interrelated.  And that is when you start

8   analyzing the issues and you start looking to see

9   whether or not there is a common legal interest for

10  purposes of any waiver exception to the attorney client

11  privilege, one of the things that you look at -- what

12  whether -- a couple of aspects here.

13         First of all, just of winning interest or

14  rah-rah we hope you win is not a common legal interest.

15  That's the *UK Miller v. Caterpillar* case.

16         THE COURT:  Right.

17         MR. DEIERMANN:  We don't think that there is

18  a common legal interest here.  We don't think that

19  these communications are privileged in the first

20  instance.  We think that the information that was

21  being provided by LST to Legalist, certain factual

22  information, ought to be discoverable.  Information --

23         THE COURT:  Those are two separate questions.

24  Let's not conflate privileged and discoverable to this.

25  There are two separate questions there.

1          MR. DEIERMANN:  I agree.  And I understand.

2     I agree with that.

3          So we're talking about the common legal

4     interest.  We don't think there is a common legal

5     interest for the purposes of the privilege.

6          THE COURT:  All right.

7          MR. DEIERMANN:  With respect to the waiver we

8     think that's true as well.

9          LST was seeking -- was -- was seeking

10    financial help.  You know, whether it's in the form of

11    a loan or we think they're just picking up the tab for

12    the legal fees that -- that's not a common legal

13    interest for purposes of a privilege or for purposes of

14    saying that if you disclose the information to a third

15    party, there hasn't been a waiver because of this

16    interest.

17         It's got to be a common legal interest, and

18    we don't think that that exists here under these

19    circumstances.

20         THE COURT:  Okay.  Let me stop you for a

21    second because I don't want to get to the privilege

22    issues if we don't have to.

23         MR. DEIERMANN:  Okay.

24         THE COURT:   If you haven't persuaded me that

25    it's relevant, then I don't have to consider whether

1    it's -- whether it's privileged or not, which, again,

2    is a legally complex question, which I don't think

3    three pages instructs us to, and so we would have to

4    have reason on that.

5            But part of the reasons we have conversations

6    like this is because why have the briefing on that if

7    another issue resolves it; right?

8            So let me ask -- I want to stick to relevance

9    for the moment.  I want to go back to your point that

10   this is relevant because it goes to the

11   abuse-of-process argument.

12           And then if I'm summarizing you correctly,

13   the theory of the abuse-of-process claim is that LST's

14   motivation here is not to win a lawsuit or to prove any

15   actual misconduct but to drive Myia out of business; is

16   that correct?

17           MR. DEIERMANN:  Correct.

18           THE COURT:  That's the theory.

19           What about the litigation funding arrangement

20   would lend support or not to that claim?

21           MR. DEIERMANN:  Well, first of all, there's

22   an indication from Steve Hendrix's deposition testimony

23   that they didn't even know if they would file a suit

24   but for the fact of the litigation funding.  That's

25   point number one.

1          In addition to that --

2          THE COURT:  Hold on a second.  Why isn't that

3    consistent with we don't have the money to bring a

4    lawsuit but we think our claim has legal merit, so

5    we're going to go see if someone else can help invest

6    in our lawsuit because we think it has legal merit, but

7    we can't bring it ourselves?

8          Why wouldn't that be a totally consistent

9    narrative, what you just said?

10         MR. DEIERMANN:  Your Honor, it could be

11   consistent with that.

12         THE COURT:  Okay.

13         MR. DEIERMANN:  But, on the other hand, it

14   could also reflect that they didn't think that this

15   case was worth bringing, maybe their trade secrets

16   claims weren't as strong as they claim they were.

17         And that leads me to the related relevance

18   point with this --

19         THE COURT:  Okay.

20         MR. DEIERMANN:  -- in terms -- with respect

21   to the arrangement between LST and Legalist.  We have a

22   number of questions along the lines of what input can

23   Legalist provide with respect to litigation, has

24   Legalist provided input as to whether or not LST should

25   be seeking an injunctive relief, either TRO or PI.

1          You know, in most trade secret cases there's

2     a request for an immediate TRO followed by a PI.

3     There's expedited discovery.   We didn't have that

4     here.  And it raises the question as to whether or not

5     Legalist was saying that we're in this for the dollars,

6     we're in this for a percentage of recovery, and if you

7     get a TRO or a PI, that's going to reduce what we

8     Legalist might otherwise recover under what terms we

9     have with LST, and so on balance maybe you shouldn't go

10    after a TRO or PI.

11         Now, you know, from our perspective that's

12    significant.   Who's really calling the shots here?

13    Who is it who's providing input?

14         Who is it who's going to have input into the

15    things such as the upcoming mediation?  Does Legalist

16    have a say-so in the mediation as to any terms of

17    settlement?

18         What kind of input have they provided?  What

19    kind of input are they entitled to provide?

20         We think all of that information is relevant,

21    Your Honor.

22         THE COURT:  Okay.   So I'm going to hear from

23    Plaintiff before I ask some questions.

24         MS. WARR:  Yes, Your Honor.   I think, again,

25    it is notable that there are -- that the Defendants

1    have not cited any case law in support of the reasons

2    that they're noting for this being relevant.

3            The fact is is that protective orders are not

4    sought in every case -- trade secret case.  There are

5    many numerous reasons that a protective order may not

6    be sought at the outset of a case.  And that discussion

7    is a question that the Defendants have asked.

8            And regardless of whether there is a

9    litigation funder, that question would be privileged

10   because whether and how to seek what information or

11   damages or any type of legal strategy in a case is

12   clearly information that is privileged.

13           Second, I think the reasons that

14   Mr. Deiermann just gave actually show exactly why the

15   information is not relevant.  If -- if the motivation

16   for filing the lawsuit were to put Myia out of

17   business, number one, that has nothing to do with

18   Mercy; but, number two, then Mr. Deiermann's

19   speculation as to what might be in some communications

20   with Legalist -- and it is nothing more than that.  It

21   is pure speculation.

22           But his speculation that Legalist might be

23   trying to essentially keep this suit going so it can

24   make more money is not consistent with filing the

25   lawsuit to put Myia out of business.  The fact is is

1    that it's not relevant.   There really is nothing that

2    the Legalist information about what is being funded and

3    why would do to support an abuse-of-process claim.

4            To the extent that there are issues or

5    questions about what role Legalist has, then LST is

6    more than willing to provide the Court with the

7    underlying documents, including the agreement itself,

8    and to answer any questions that the Court has to

9    ensure that Legalist's role here is not stepping

10   outside of the bounds that have been set by the Court

11   with regard to litigation funding.

12           THE COURT:  Is that a process -- sorry, let

13   me -- sorry to interrupt, but before we get to the next

14   point.

15           Is that a process that is commonly followed

16   in courts in this kind of situation?

17           MS. WARR:  It is not uncommon for courts if

18   there are questions about the role of the litigation

19   funder to look at the agreement itself or to ask in

20   camera questions or to look at other types of

21   privileged communications with the legal funder and to

22   make a determination on either relevance or privilege

23   or work product after having assured itself that there

24   are no real issues that need to be raised.

25           THE COURT:  And what kind of role would be

1    untoward of the role of the litigation funder here?

2         MS. WARR:  There is some case law that says

3    that the level of the litigation funder's involvement

4    in the case can in some cases equate to potential

5    issues like champerty if they are controlling the

6    entire case.  You know, we can assure you you will be

7    satisfied that is not the case here.

8         But there are particular discreet issues

9    about essentially if the litigation funder is managing

10   the case and counsel is not.  So that -- that would be

11   I think an issue that would very clearly could be

12   answered by the funding agreement as well as the

13   actual -- if the Court believes that there may be some

14   issues related to the amount of funding or how that

15   plays out, then those amounts the Court would be able

16   to look at itself as well.

17        THE COURT:  And you've already produced some

18   information about this arrangement; correct?

19        MS. WARR:  We have produced -- we have a lot

20   of witnesses to answer information about the name of

21   the funder, who they have communicated with at the

22   funder, whether there are or not -- you know, there

23   were communications with certain people.

24        What we have not allowed witnesses to answer

25   that have not produced communications about are the

1   underlying agreement itself, the contents of the

2   agreement, including the amount of funding, what

3   happens, you know, if there is a recovery of certain

4   amounts who gets what or any information where counsel

5   was providing any type of advice, if there was any.

6          THE COURT:  Okay.  Mr. Deiermann, am I

7   saying that right?

8          MR. DEIERMANN:  You are, Your Honor.

9          THE COURT:  What exactly do you think -- if I

10  were to permit you to discover all this information,

11  what's the scenario in your head that would support

12  that there's been abuse of process?

13         Exactly what kind of financial arrangement

14  between the two of them would suggest or support your

15  theory that LifeSciences is in it to put Myia out of

16  business?

17         MR. DEIERMANN:  I think any kind of

18  communications in which LST acknowledges or recognizes

19  that a lot of the information that it is claiming is

20  trade secret really isn't.

21         Any kind of admissions along the lines of,

22  yeah, we know under the contract, you know, this

23  agreement says X, Y, and Z are owned by Mercy, but, you

24  know, that sort of thing.  Any kind of communications

25  with respect to whether or not injunctive relief should

1    or should not be pursued.

2           Again, I think that's important to the extent

3    that LST on the one hand wants everybody to believe

4    that these are trade secrets or it's going to be

5    leveled like that, and yet they haven't pursued it.

6           Instead -- you know, I hate to use the term

7    "scorched earth," but Your Honor is aware of how

8    contentious this litigation has been and the amount of

9    discovery that's taken place.  And from my

10   perspective, that's going to put Myia, you know, on the

11   verge, so to speak.

12          So the kinds of information we're looking for

13   it goes beyond just what's in the agreement.  We were

14   asking questions in the deposition and getting just

15   blanket instructions not to answer as to the content of

16   any communications regarding X.  And that's much too

17   broad.

18          I asked point blank, Does Legalist have any

19   right or ability under the agreement to make decisions

20   pertaining to whether injunctive relief should be

21   pursued?  And Nicci said same objection directing

22   witness not to answer.

23          So, I mean, we have this wide variety of

24   instructions not to answer.  It goes beyond what is in

25   the funding agreement.  It also pertains to

1    communications as to what LST was telling Legalist,

2    what Legalist in turn was communicating to LST.

3            We're not interested in getting any kind of

4    Stinson mental impressions, legal analysis, things like

5    that.  We're interested in getting factual

6    information.  And the instructions --

7            THE COURT:  You don't think reasons for or

8    against seeking injunctive relief would fall under some

9    kind of reason or what's going on with Stinson

10   impressions?

11           MR. DEIERMANN:  It depends on what those

12   reasons are, Your Honor, very candidly.  If the reasons

13   are from Stinson the likelihood of success, well,

14   obviously, that's a mental impression, and that's one

15   thing.

16           THE COURT:  Uh-huh.

17           MR. DEIERMANN:  If the reason is if LST wants

18   to roll the dice because it's in this percentage of the

19   recovery and LST is going to say, okay, we won't go for

20   injunctive relief, I think that's relevant.  I think

21   we're entitled to know that.

22           THE COURT:  Is there a reason -- because

23   reading your -- the case that you guys cited, *Nunes*,

24   it -- there seems to be some burden on the Defendant to

25   show why there is a suspicion to be -- that there's

1    something untoward going on in this case.

2          Now, everything you're describing seems to me

3    to be -- I mean, I can see the Defendants' reasons for

4    wanting to know this information.  However, if there's

5    something about this case -- so far you've mentioned

6    the fact that they did not pursue injunctive relief.

7          Is there anything else here that

8    distinguishes this from a trade secrets case between

9    competitors where, you know, the one on the defense is

10   certainly going to be looking for any basis to -- you

11   know, to cast doubt on the merits of the Plaintiff's

12   claims and so would like to see anything relevant to

13   the litigation -- or anything, sorry, that could kind

14   of besmirch their opponent even if it's not relevant?

15         MR. DEIERMANN:  I'm not sure I understand --

16         THE COURT:  All right.  Let me try to

17   rephrase.

18         What -- why is there something in this case

19   that makes it different from other trade secret cases

20   where competitors would like to know things about each

21   other and why they're doing what they're doing?

22         MR. DEIERMANN:  So in addition to what I've

23   already mentioned early on after this was first raised

24   back in the March, April 2021 time frame Myia's counsel

25   offered to have an independent expert do a comparison

1    of the structure, sequence, and organization of the two

2    sibrits, and LST rejected that.

3         Now, they've got their reasons for rejecting

4    that.  We and Myia think that that would have gone a

5    long way, to, perhaps, resolving things.

6         But, again, does that then tie into what the

7    real purpose of the litigation here is?  Is the purpose

8    to get to the bottom of it or it's the purpose to make

9    things expensive so as to make it difficult for Myia to

10   continue to exist?

11        In addition to that, Your Honor -- and,

12   again, this is coupled with that abuse-of-process issue

13   that I've already mentioned -- at the same time LST

14   filed this lawsuit within a day or two days or two days

15   after that they issue a press release that effectively

16   denigrates Myia and directly impacts their ability in

17   the marketplace.

18        The press release, as you can imagine, it's

19   going to be picked up by any number of media outlets,

20   and any customer or potential customer that sees that

21   and who is contemplating doing business with Myia is

22   going to have to think twice about that because when

23   you look at the press release, the question is, why

24   would we do business with Myia when maybe their

25   software is tainted and they're not going to be able to

1   use the software?

2          So, again, when you -- when you roll it all

3   up and you start looking at it, you start thinking

4   what's the real purpose of this lawsuit?  We think that

5   LST was trying to put Myia out of business through the

6   litigation, through the press release.

7          They weren't interested in resolving this

8   through Myia's offer of a structure, sequence, and

9   organization type of analysis.  And then the presence

10  of a litigation funder fits right into it because

11  again -- and I understand Your Honor's point that, gee,

12  maybe they just needed the money and that's why LST got

13  the litigation finance and isn't that normal.  That's

14  one explanation.

15         The other explanation is they wanted to make

16  sure that there was no risk to LST.  They did that

17  through hooking up with Legalist.  And once they

18  protected themselves in terms of the legal investment

19  in the lawsuit, only then were they going to pull the

20  trigger.  And the advantage of having that deep pocket

21  Legalist is that they can go after Myia and try to put

22  Myia out of business.

23         THE COURT:  Okay.  Ms. Warr, do you want to

24  briefly respond to any other bases?

25         MS. WARR:  Sure.  I'll just say briefly, Your

1    Honor, I think the speculation that Mr. Deiermann is

2    engaging is not really consistent at all.

3         I don't -- if LST's purpose were to put Myia

4    out of business, it would be very bizarre for a legal

5    funder who Mr. Deiermann plays just wants to roll the

6    dice to make money to fund a lawsuit where it's not

7    going to make any money but it's just going to put a

8    market competitor out of business.

9         So I just think there's an internal

10   inconsistency even in the argument that Mr. Deiermann

11   is making.

12        THE CLERK:  Judge, I'm really to sorry

13   interrupt.  I don't see our court reporter.

14        THE COURT:  Alison?  Okay.

15        THE CLERK:  But I do see that her phone is

16   still on here.  I want to make sure that we're not --

17        THE COURT:  Let's pause for a moment

18   because it's much harder by phone than it is by video.

19   I want to make sure she can still see.  Let me contact

20   her.  I'm sorry.  Hold on.

21        (A discussion was had off the record.)

22        (Proceedings resumed via Zoom for all parties

23   except the Court Reporter participates by phone.)

24        THE COURT:  All right.  Where were they?  I

25   think you were speaking to -- yes -- it looks like

1    arguments that give rise to the justification for

2    disclosing the funding information.  Go ahead.

3              MS. WARR:  Yes, Your Honor.  I don't think

4    the arguments that have been put forth are consistent

5    with the rationale that are being put forth.

6              And, you know, in addition, the idea that

7    issuing a press release related to litigation or not

8    giving into the other side's demands for any type of

9    inspection under which LST would have to have paid for

10   with no court protection for its information that

11   somehow this is so unusual as to require the disclosure

12   of litigation funding in this case I think is just

13   unsupported by the case law.  Those are not uncommon

14   occurrences in any type of litigation, and including

15   this type of litigation.

16             And finally I just wanted to correct the

17   record a little bit.  You know, Mr. Deiermann several

18   times, I think, accused LST of what he calls scorched

19   earth litigation or increasing the burden.  We realize

20   the parties in this case are obviously disagreeing

21   about a lot of things, but, you know, LST has not done

22   anything to increase the burden on the litigation.

23             LST has consistently throughout tried to make

24   the litigation as efficient as possible.  You know, it

25   is actually Mercy that has, you know, increased the

1    burden in this litigation by including, you know,

2    asking for hundreds of RFs.  Many of which were

3    duplicative and many of which involved legal issues and

4    things that could not be appropriately answered in an

5    RFA.

6              So I don't think we're here to have a fight

7    about who, you know, is doing wrong in discovery.  But

8    I just wanted to make sure that it was clear that LST

9    does not believe that it has done anything in this

10   litigation to extend litigation.  That would actually

11   be inconsistent with the idea of a litigation funder in

12   general.

13             So I don't know of a reason why that this

14   case is outside the norm and the Court should step out

15   and find that litigation funding, which is generally

16   disfavored, should be ordered in this specific case.

17             THE COURT:  Okay.  Thank you.

18             You're right.  I'm not -- we're not here to

19   discuss who's done what to whom in the discovery

20   context.  I think we would need a lot more time if you

21   were all going to put your arguments on the table about

22   who has done something wrong in the context of

23   discovery.  So we're not going to go there, and I hear

24   everybody, and I am disregarding it all.

25             Okay.  What I am here to decide is whether

1    or not this information is discoverable.  And given

2    that the presumption is against Defendants probably

3    comes as no surprise that I -- at this time I'm not

4    going to authorize the discovery of this information

5    based on relevance.

6              So not even getting to the privilege issue, I

7    don't find it relevant yet based on what I have heard.

8    And the reason for that is because at least based on

9    the case law that I've seen -- and I realize this is an

10   area of law that's in flux -- there needs to be some

11   kind of showing of something untoward beyond just the

12   kinds of things you might see from a litigant even if

13   there were no litigation funder involved.

14             And so far all I've heard are things that

15   while they might be motivated by putting Myia out of

16   business I can't speak to that.  I can't -- I can say

17   that I -- there are other possible reasons, maybe not

18   other than putting Myia out of business, but other than

19   the fact that they have a litigation funder or they

20   have some kind of nefarious purpose in bringing the

21   litigation, other factual reasons for all of the things

22   that you've mentioned, the press release, choice not to

23   pursue injunctive relief, if I found that that was

24   enough, what seemed to me to be relatively typical

25   litigation tactics, then that would open the door for

1    this kind of discovery in the mine-run case, which I

2    don't think the case law supports that.

3           And so until I hear something that separates

4    this from that kind of case -- in *Nunes* there was a

5    very specific relationship with the legal claim that

6    made it the case that who the plaintiff -- the real

7    party of interest that the plaintiff was made a

8    difference to the case the plaintiff had to make.

9    That's not anything I've heard here so far.  And so I'm

10   not going to find that the litigation funding is

11   relevant.

12          Now, that doesn't mean that you can't prove

13   it, because I've only given you a page and a half.   So

14   if you want to move to compel and show me based on

15   further case law and research that there is some basis

16   for the disclosure -- requiring the disclosure of some

17   of this information and hoping I'm sure of healing your

18   motion, but I'm telling you right now based on what I'm

19   reading I think the deck is stacked against you.

20          Mr. Deiermann, anything?

21          MR. DEIERMANN:  Yes, Your Honor.   There were

22   a couple of other aspects pertaining to relevance that

23   I wanted to mention.

24          THE COURT:  Okay.   Please.   So far here's

25   where we are, but go ahead if you have more.

1          MR. DEIERMANN:  I understand.  I understand.

2          One of the issues is what factual information

3     was provided by LST to Legalist.

4          THE COURT:  Yes.

5          MR. DEIERMANN:  And the questions in that

6     regard include what did Brent Kevern, who is one of the

7     four principals of LST, discuss with Legalist

8     pertaining to Myia's alleged accessing of LST's alleged

9     trade secret information.

10          Part of this involved allegations that the

11     LST system was accessed -- there were 13,000 hits or

12     transactions I think they call it it's probably more

13     accurate.  Now, the question is out of those hits

14     what, if anything, was significant, what, if anything,

15     is from Myia as opposed to predating when Myia was even

16     involved.

17          And Mr. -- according to Mr. Hendrix he

18     thought that Mr. Kevern interpreted some of the

19     information in one of the telephone calls with Legalist

20     regarding the 13,000 hits.  And that is contained in

21     Exhibit A to the joint memo.

22          And if you bear with me, I can find it, but

23     that kind of information, namely, what is it that

24     Mr. Kevern said or provided to Legalist pertaining to

25     any trade secrets, anything that was totally trade

1    secret that was accessed is relevant.

2         And with respect to these 13,000 hits what

3    part of those 13,000 hits was significant, what -- what

4    was his interpretation I think is the language that

5    Steve Hendrix used.  So, again, that focuses on the

6    communications between LST and Legalist.

7         The other -- another example would be

8    patient --

9         THE COURT:  Can you stop for a second and

10   tell me -- I just need a little bit more information

11   about that.

12        Mr. Hendrix thought that Mr. Kevern said

13   something that undermines the litigation charge that

14   LST has advanced?

15        MR. DEIERMANN:  No.  No, Your Honor.

16        THE COURT:  Okay.

17        MR. DEIERMANN:  So there were -- there's some

18   sort of spreadsheet.  I think it shows every time

19   that -- that m.Care was accessed and LST created an

20   issue of that, and they said 13,000 hits suggesting

21   that Myia was in there for a year just ripping through

22   everything.

23        But putting that aside for a minute, the

24   question is out of that 13,000 hits what's truly

25   significant?  And we've been trying to figure that out

1   since very -- actually since day one, back to March of

2   2021.

3            THE COURT:  Okay.

4            MR. DEIERMANN:  And if you give me just a

5   minute here, and I apologize, I don't have the exact

6   page in front of me.   I asked about that particular

7   discussion -- just bear with me for a second, Your

8   Honor.  Here we go.   It's in Exhibit A to the joint

9   memo.

10           THE COURT:  Okay.

11           MR. DEIERMANN:  I'm looking at pages 295 and

12  296.

13           THE COURT:  Okay.

14           MR. DEIERMANN:  And it starts on page 294.  I

15  asked Mr. Hendrix, "What factual information was

16  provided to Legalist?"

17           And then skipping the objection, Hendrix

18  says, "I'm fairly certain we provided them the

19  technical evidence of the transactions that took place

20  during the time period in question meaning footprints,

21  the IP addresses, all of that, provided them that

22  information."

23           And then skipping down, "Whether it was an

24  Excel spreadsheet or whether it was something else,

25  what I'm really looking for" -- and this is me asking

1   the questions -- "as specifically as you can what

2   factual information was provided to Legalist?"

3          Mr. Hendrix says, "Like, so, again, if I'm

4   remembering correctly, we provided those example

5   transactions with our interpretation of those -- of

6   what that meant."

7          I asked, "who provided interpretation of what

8   that meant?"

9          The answer was, "That would have been Mr.

10  Kevern."

11         And then I continued, "what is it that he

12  described or that he interpreted as having been

13  accessed?"

14         Ms. Warr objected, said that, "I also think

15  that's calling for more context about the description

16  to the extent the witness knows.  So I would direct

17  him not to answer."

18         So, again, what I was trying to uncover there

19  was factual information that we've been trying to get

20  all along, which is what was communicated to Legalist

21  and to the extent that anything was communicated in

22  terms of what trade secret was really misused, and, if

23  so, how.

24         We had this issue with 13,000 hits.  Well,

25  tell me specifics basically about the 13,000 hits.

1    And if Mr. Kevern provided an interpretation of that, I

2    think we're entitled to get that.  I don't think that's

3    work product.  I don't think that's privilege.   I

4    think that's factual information, and yet we had an

5    instruction not to answer.

6              THE COURT:  Mr. Kevern's own interpretation

7    is factual information you're entitled to discover?

8              MR. DEIERMANN:  Yes.

9              THE COURT:  And the way you wanted to

10   discover it is by asking Mr. Hendrix?  Is that his

11   name?

12             MR. DEIERMANN:   Well, we had -- I had

13   Hendrix before me at the time --

14             THE COURT:  Uh-huh.

15             MR. DEIERMANN:  -- that we were asking him

16   about information that was provided to Legalist and

17   vice versa.

18             THE COURT:  Okay.

19             MR. DEIERMANN:  And that's when we got into

20   this issue where I asked him what factual information

21   was provided to Legalist.

22             Again, we were trying to find out, What are

23   the real trade secrets here?  What are you claiming is

24   the real trade secret?

25             And to the extent that Hendrix or Kevern or

1    the others on this telephone call -- and, by the way,

2    my understanding from his testimony and that -- and/or

3    that of Mr. McCarthy, who is the LST chairman, I think

4    his position is the three telephone calls that they

5    have described as having had with Legalist, none of

6    those involved attorneys on the line.   To their

7    knowledge no attorneys were on the line.

8              So when we have Mr. Kevern saying, Yeah, I've

9    got this spreadsheet that shows 13,000 hits.   Let me

10   give you my interpretation of it.   I think that's

11   factual information that we're entitled to have.   If

12   somebody's going to testify -- and to the extent that

13   he testified -- or to the extent that Mr. Kevern

14   described that to Legalist and is on that call, we're

15   entitled to ask Mr. Hendrix, What is it that Kevern

16   said?

17             THE COURT:   Ms. Warr, why aren't they

18   entitled to ask for that information?

19             MS. WARR:   Your Honor, again, I think we're

20   moving past the relevance issue and into the privilege

21   issue.

22             They are absolutely entitled to ask Mr.

23   Kevern what his interpretation of the spreadsheet that

24   does show, you know, thousands of actions by Myia in

25   the system, what that means.

1          They've had Mr. Kevern in deposition for

2     eight hours -- or for seven full hours.  They took the

3     full time.  They've had that document in their

4     possession for well over a year now since almost the

5     very beginning of this litigation.

6          And if they want to ask questions about that

7     of Mr. Kevern, they had that opportunity in his

8     factual -- in his factual disposition.  Mr. Kevern is

9     also going to be one of the 30(b)(6) representatives.

10    They can ask those questions again when Mr. Kevern

11    stands for a 30(b)(6).

12         There is no need for that information to come

13    through the Legalist pipeline.  They haven't shown

14    how -- how -- what anybody at LST said to Legalist

15    versus how they would answer that same question when

16    directly given to them would somehow change the

17    litigation.

18         So I think all I heard was an argument as to

19    why the underlying facts themselves are relevant, and

20    those can clearly come from Mr. Kevern and all the

21    other LST witnesses who have been deposed and the

22    corporate representatives who will be deposed.

23              THE COURT:  Mr. Deiermann.

24              MR. DEIERMANN:  Your Honor, what Mr. Kevern

25    or what Mr. Hendrix says to Legalist may or may not be

1    the same as what they say to us.   We've been trying to

2    get to the bottom of this trade secrets claim since day

3    one.

4         As we sit here today, we still don't know

5    what was supposedly misused by Myia or how.   The

6    answers we have gotten factually are things such as

7    only the experts can tell how Myia used anything or

8    incorporated anything, and only then can the experts

9    say what the damages are.

10         We have no factual information.  So when

11   we're talking with whether it's Mr. Kevern or

12   Mr. Hendrix, and we're asking Hendrix, What did Kevern

13   say to Legalist about these 13,000 hits?  What did he

14   say was truly trade secret?  What did he say, if

15   anything, was misused?

16         13,000 hits or footprints or whatever you

17   want to call it doesn't mean anything.   The question

18   is what is it in particular in those 13,000 that it's

19   somehow trade secret or reflects an improper misuse on

20   Myia.  And --

21         THE COURT:  How would you use -- sorry to

22   interrupt, but how would you use what Mr. Kevern

23   said -- I'm sorry, what Mr. Hendrix says about Mr.

24   Kevern in a -- you know, when Mr. Hendrix said what Mr.

25   Kevern said and at times in that context in the

1   litigation to go for one of your claims or defenses?

2   How would that be possibly illegal?

3          MR. DEIERMANN:  Oh, so it could be used in a

4   couple of ways, Your Honor.

5          If Hendrix's recollection is different than

6   what Kevern tells us, then that's discoverable.  It

7   goes directly to Kevern's credibility.

8          If Legalist had notes about what -- what Mr.

9   Kevern was saying, and if those notes were inconsistent

10  with what Kevern or anyone else tells us in the

11  litigation, then, again, it goes to their credibility.

12         One of the big issues here is what is truly

13  trade secret.  What is truly or what was truly misused,

14  if anything, and who owns that information and who has

15  the right to use it.

16         And this threshold question about -- and,

17  again, we've seen it splashed around in the Complaint.

18  It's been banded about several times since then.

19  13,000 hits.   13,000 hits.   You can look at that

20  spreadsheet, and it doesn't mean diddly unless you know

21  what is really significant.

22         And so Hendrix's recollection of what Kevin

23  told Legalist is very relevant.  It's relevant for

24  purposes of determining what the reality is.   It's

25  relevant for purposes of determining what Mr. Kevern's

1    credibility is when he testifies.

2              And, yes, we have a 30(b)(6) witness or

3    30(b)(6) deposition coming up within the next two

4    weeks, and part of that is going to be with Mr. Kevern

5    on certain topics, the techie topics as we've been

6    describing them, and the other topics are to be handled

7    by Mr. Hendrix.

8              If Mr. Kevern were to say, This is my -- this

9    is the way I'm looking at these 13,000 hits, it could

10   be very relevant as to whether or not that's consistent

11   with what he told Legalist when they were having their

12   discussions with Legalist back presumably in the summer

13   of 2021.  It goes directly to his credibility.  It

14   goes directly to what's really an issue here.

15             THE COURT:  Okay.  Ms. Warr, I  mean, the

16   standard for discoverability is broad, and credibility

17   of a witness is always relevant, so how can I find that

18   asking a witness or asking about what a witness said at

19   another context is not relevant?

20             MS. WARR:  Your Honor, I think that witness

21   credibility is an issue in every case.

22             And so counsel has not presented any reason

23   that this case is different from all of the various

24   cases that have said that this type of issue just isn't

25   relevant.   There is -- there's nothing --

1          THE COURT:  I'm talking about the arrangement

2     of a litigation funder and the litigants.   That bucket

3     is generally disfavored as discoverable.

4          That doesn't mean nothing is ever said in the

5     presence of someone who's a representative of the

6     litigation funder is ever relevant; right.

7          MS. WARR:  Correct, Your Honor, but there

8     are -- the issue of relevance here has to be something

9     broadly about the relationship where it is specific to

10    this case.

11         Anything anybody has ever said about anything

12    else is not something that is -- whether or not it was

13    to a litigation funder or not -- first of all, I think

14    Mr. Hendrix did answer the question to the best that he

15    could about what was said to the litigation funder, so

16    the underlying facts.

17         But, second of all, the issue of how to

18    interpret the 13,000 or however number many it is hits

19    of what Myia was doing in the system is something that

20    can and should have been asked of Mr. Kevern.

21         To the extent that somebody might say, oh,

22    well, he said something different to somebody else, I

23    think Mr. Hendrix did answer the question of what he

24    understood Mr. Kevern said to him.

25         So to the extent you're looking to try to

1   catch a witness out in some type of, you know,

2   miscommunication or inconsistency, I think that's all

3   just pure speculation that *AT&T* says isn't the type of

4   thing that makes any type of communication even with

5   the litigation funder relevant to a case.

6        I don't think Defendants have presented any

7   reason to believe that Mr. Kevern's answers would be

8   any different to them had they actually asked them and

9   when they do ask than they would be to anybody else.

10        THE COURT:  So that question was not posed to

11   Mr. Kevern?

12        MS. WARR:  That direct question was not posed

13   to Mr. Kevern during his factual deposition.

14        THE COURT:  Uh-huh.

15        MR. ROODMAN:  Your Honor, this is Dave

16   Roodman.   I think I just want to interject here

17   because I took Mr. Kevern's deposition.

18        THE COURT:  Okay.

19        MR. ROODMAN:   He was instructed not to

20   answer any questions regarding the litigation funder,

21   and, in fact, we didn't even know the name of the

22   litigation funder at that time.

23        So it was the first deposition that the

24   litigation funder came up.   We were completely cut off

25   from asking him questions based upon privilege.   So

1    there was no way to go down that road at that time.

2         And I think the fundamental question is can

3    we -- can we depose Mr. Kevern on these questions, or

4    are we going to be roadblocked again on these types of

5    factual issues that Mr. Deiermann has raised?

6         MS. WARR:  And, Your Honor, I think the

7    questions mean has the Defendants asked

8    Mr. Kevern about his interpretation of the spreadsheet.

9         THE COURT:  That's what I understood --

10        MS. WARR:  That's what I understood your

11   question to be, and the answer to that is no.  Instead

12   they tried to go at it through a privileged

13   communication instead of just asking the question

14   directly, and I think that shows the real purpose here.

15        THE COURT:  Okay.  Well, hold on a second.

16        Mr. Roodman, was there any confusion about

17   what I was asking?

18        MR. ROODMAN:  I was confused about that, Your

19   Honor.

20        THE COURT:  Okay.

21        MR. ROODMAN:  I didn't realize that's what

22   you were asking about.

23        THE COURT:  Did you talk to Mr. Kevern about

24   the spreadsheet?

25        MR. ROODMAN:  No, I did not have that

1    spreadsheet in front of -- I don't know when that

2    spreadsheet was produced or if we even had it then.

3              THE COURT:  Okay.

4              MS. WARR:  Your Honor, that spreadsheet was

5    produced well before Mr. Kevern's  deposition.

6              THE COURT:  Okay.  But the -- okay.  The

7    thing I'm struggling with is whether there's a

8    difference between information about the relationship

9    between the litigation funder and the litigants that

10   courts have generally found to be not relevant to the

11   substance of the litigation itself and then questions

12   you would just ask someone in a -- be able to normally

13   ask that if the information is not privileged there's

14   not any particular reason why they shouldn't be allowed

15   to answer.

16         So I'm reading the specific thing that

17   Mr. Deiermann is bringing to my attention.  And there

18   were a number of objections.  He went ahead and

19   answered several of the questions.

20         Mr. Deiermann, what is it that you don't

21   think you got that you could have gotten if I were to

22   rewrite or to provide that it was relevant?

23             MR. DEIERMANN:  Well, focusing on this

24   specific issue, again, right now I'm looking at

25   page 297 of Mr. Hendrix's deposition transcript.  And

1    you'll see the objection about I was calling for more

2    context about the description, "To the extent the

3    witness knows, so I would direct him not to answer."

4    I then explained what I'm trying to do.

5              Counsel again talks about her objection.   I

6    say, "Can you give me any more details as to any

7    factual information that was provided to the litigation

8    funder?"   "No, I can't." I think that was subject to

9    the instruction not to answer.

10             I think that, you know, we're entitled to

11   know what he recalls about Brett Kevern's

12   interpretations.   You know, he mentioned it on

13   page 296.

14             THE COURT:   I guess I'm wondering  what this

15   has to do with the litigation funder.   I mean, you're

16   asking -- you're asking for this information because it

17   mattered, not because it was provided to the litigation

18   funder; is that correct?

19             MR. DEIERMANN:   Correct.   What we're

20   asking for -- we're asking for the information for two

21   reasons.   One, obviously the substantiative

22   information is relevant.   Two, the question is what is

23   it that Mr. Kevern described at the time.   And, again,

24   presumably this goes back to the summer of 2021 before

25   the lawsuit was filed.

1          What is the significance?  You know, of these

2     13,000 what is it that Kevern at the time said was

3     significant?  What was his interpretation of it?

4          MS. WARR:  And, Your Honor, I believe that

5     question was answered.  If we look at page 297,

6     Mr. Deiermann asked, "Can you give me any more detail,

7     sir, as to any factual information that was provided to

8     the litigation funder?"

9          There was no objection on the basis of

10    privilege or anything else.  And the answer was, "No, I

11    can't."

12         So they have the information that they seek.

13    It's simply Mr. Hendrix didn't have any more

14    information.  He wasn't the person who provided that.

15    And to the extent they want to ask Mr. Kevern at the

16    corporate deposition, then they are free to ask the

17    question of his interpretation and how he has

18    interpreted that contract before.

19         And if there are factual -- factual things

20    that were said to the litigation funder outside the

21    context of any type of discussion with counsel or any

22    type of attorney/client impressions, then Mr. Kevern

23    when asked that question could answer that as well.

24         But I think the clear answer from the

25    transcript was that they asked the question, and

1    Mr. Hendrix didn't know.

2         MR. DEIERMANN:  I don't think that's correct,

3    Your Honor.

4         THE COURT:  Ms. Warr, every other sentence

5    here is an objection from you that the witness should

6    not go beyond a certain point or the witness should not

7    answer.

8         So I think it's a little -- a little bit much

9    to say that, oh, the witness was probably forthcoming

10   with everything he had on -- we can assume from "I

11   can't" that that means I have no information as opposed

12   to I don't think I can because here's my attorney

13   objecting over and over.

14        So I don't think that's an obvious -- what

15   you're suggesting is not an obvious interpretation of

16   the transcript in any case.

17        And so the question really may in this

18   particular -- on this particular point is, are these --

19   are the objections you're making in the text justified

20   and on what basis.

21        Now, the objection I'm trying to read is on

22   the basis of foundation, calling for more context about

23   the description to the extent the witness knows.

24        Okay.  There's one question here, which is is

25   everything having to do with the litigation funding

1    discoverable.  I don't think it is.  I don't think

2    there's carte blanche because of what Plaintiff has

3    done generally to discover everything about their

4    relationship with their litigation funder so far.

5         Maybe I'll be surprised by the facts that can

6    be brought to bear in a motion to compel.

7         Another question is whether you can cut off

8    every conversation where the litigation funder is

9    mentioned in the context of a deposition or elsewhere.

10   That's -- that's a distinct question.  And I don't

11   know -- it's not as obvious to me from the case law

12   what the answer to that one is.

13        This information, what is being discussed, is

14   clearly relevant -- sorry -- the fundamental

15   information, what's in that spreadsheet, and, you know,

16   how it's been interpreted.

17        What was said to the litigation funder is a

18   second level, and if it's just about communications

19   with the litigation funder, I'm not sure I see the

20   relevance, but I certainly see the relevance of the

21   underlying information.

22        And so if we're going to draw the line at

23   because the litigation funder was mentioned here it's

24   all of a sudden we don't get to talk about that topic,

25   then I think there the onus is on you, Ms. Warr, to

1    show why information that would otherwise be relevant

2    suddenly becomes off limits.

3           That sounds like a privilege question to me

4    just on reading it right here.   Is this information

5    privileged?  Is there some reason why this -- this

6    deponent should not have had to answer those questions?

7    And I don't see in the transcript the basis for a

8    privilege.

9           I'm not -- certainly not on that basis going

10   to green light the discovery about all information

11   related to the litigation funder because here it seems

12   to me the question is quite different than the question

13   about the terms of the contract.

14          Does that make any sense?

15          MS. WARR:  Yes.

16          THE COURT:  I think we're in two different

17   categories.

18          And, Mr. Deiermann, I don't see that as a

19   basis for everything you're asking for, but you may

20   well be entitled to the answers to these questions.

21          Ms. Warr, can you give me a basis for finding

22   this information privileged based on who these people

23   are and what kinds of context the conversation arose

24   in?

25          MS. WARR:  Yes, Your Honor.  And, again, I

1    think the objections, as you can see, were -- there

2    were -- the objections were to make clear because when

3    you have a witness in deposition they have to

4    understand what they can and cannot say.

5         And so the objection was -- if you look at

6    the line of questioning, it was not directing the

7    witness not to answer.  It was making the privilege

8    objection to make clear that the witness to the extent

9    that they were having the conversations in the context

10   of the discussions with counsel or talking about

11   strategy should not be disclosing that privileged

12   information.  But if they wanted to disclose facts that

13   were given in discussions, they could disclose the

14   facts.

15        And so I understand that that may not be as

16   clear from the transcript as I would hope.  It was --

17   you know, there were a lot of discussions about this

18   and a lot of questions coming fast and furious.

19        But it is true that the -- you know, the case

20   law supports that discussions with the litigation

21   funder not about actual underlying facts but about

22   strategy or attorney impressions can be protected under

23   the joint -- under the Joint Interest Doctrine and were

24   part of privilege.

25        And so that was what this was meant to do,

1    which is the same way that all of the Defendants have

2    answered questions that may invoke privilege.  If

3    there's not a direction not to answer, then it is

4    telling that witness, Be warned.  Don't just blurt out

5    anything an attorney said or any type of thing, that

6    they are asking for the factual deposition -- or the

7    factual circumstances.  That is what you may answer.

8            THE COURT:  Okay.  Mr. Deiermann, you did

9    ask, "Did Legalist provide any evaluation or assessment

10   of any claim or potential claim with LST?"  And Ms.

11   Warr advises that he could say yes or no.  And he said,

12   "Not that I'm aware of."

13           That doesn't answer questions that you were

14   seeking to answer still?

15           MR. DEIERMANN:  Your Honor, what page were

16   you looking at?  I'm sorry.

17           THE COURT:  I'm looking at the -- I'm looking

18   at 298, the part that's not highlighted, in between the

19   highlighted section.

20           MR. DEIERMANN:  As to that answer, we're not

21   contesting that answer and that -- that instruction.

22           THE COURT:  Right.

23           MR. DEIERMANN:  But there are -- that there

24   are others in here.  Just to cite a couple of examples,

25   Your Honor, if you look at -- let's see.  Here we

1    go -- pages 294 and 295.

2            THE COURT:  Uh-huh.

3            MR. DEIERMANN:  The theme that I start by

4    asking on 294, "Were any facts provided to Legalist

5    with respect to any claim by LST as to what Mercy or

6    Myia had done improperly?"

7            "Objection.  You can answer that yes or no."

8    The answer was, "Yes."

9            "For a copy of the -- any other agreement

10   provided?"  "Don't remember."

11           And then the next question, "Was there any

12   factual description of any alleged trade secret

13   provided to Legalist?"  "Don't remember."

14           "What factual information was provided to

15   Legalist?" "Objection.  The witness may answer only

16   as to specific facts but not as to any discussion about

17   those facts."

18           Again, I think -- I think we're splitting

19   hairs there, you know.

20           We have a similar issue.  If you go back to

21   pages -- at page 245 and 246.  At the bottom of

22   page 245 I was asking Mr. Hendrix if he's been a party

23   to communications with Legalist.  The answer was,

24   "Yes."

25           Then on to 246, the combination of in writing

1    and by telephone.

2           And then we go down to page 246, lines 13 and

3    14 where counsel says, "We will not allow any

4    discussions about the content of any communication."

5           So, again, it's that kind of instruction that

6    I think it is overbroad.

7           Your Honor -- Your Honor broke this down into

8    two thoughts.  You basically spoke first about what

9    I'll call deal documents, and which you said were

10   generally disfavored and,  you know, things like that.

11          Well, the cases made pretty clear that the

12   context is important, and the context with respect to

13   the questions that are asked, with respect to the

14   documents that are in issue.

15          You know, there are a number of cases where

16   the courts have had in camera review of documents to

17   determine the extent of relevance, to determine the

18   extent to which anything may or may not be covered by a

19   privilege and if there's been a waiver.

20          The deposition questions that we have here

21   are good examples when I'm asking questions such as,

22   Does Legalist have the right to -- or has Legalist

23   provided any input with respect to any issues.

24          Well, again, that goes -- and that wasn't on

25   the page that I gave you, but that's in there

1    somewhere.   That goes to the question of who's really

2    controlling things, who's calling the shots.

3            And I mentioned before it's going to tie into

4    any number of things, including the upcoming mediation,

5    but to what extent is Legalist providing input into key

6    issues here?  And I don't think that's covered by a

7    privilege.   I don't think that's covered by work

8    product.

9            If Legalist is providing input and if that is

10   somehow affecting what's going on in the litigation, I

11   don't think that's protected from discovery.

12           THE COURT:  There is -- my reading of the

13   case law is that if there is a showing to show that

14   there is something untoward, there is some reason to

15   believe there's something untoward.

16           Your suspicion that the litigation funders

17   might be playing a role in the litigation has got to be

18   an issue in every single case involving litigation

19   funders.

20           So that to me is not just -- just the

21   suspicion or the desire to know about that, what role

22   they are playing in the decision-making, is not a green

23   light for everything about the litigation funder is

24   relevant.

25           What you're asking me about, a specific

1    interaction and asking questions about what information

2    was provided to a litigation funder, that's I think a

3    separate question as I described, a much more discreet

4    question about the specific information you're seeking

5    and why or why not the Plaintiffs might be able to

6    invoke some kind of privilege against disclosing.

7           And that's a question I already said I would

8    need to have to read as far as if there's privilege --

9    sorry.  I don't know if I said it already -- if they

10   are privilege invoked.  We obviously don't have enough

11   information about that for me to make calls about that

12   at this point in this context.

13          But I disagree that the fact that they are

14   invoking some kind of privilege around their litigation

15   funding conversation is -- is what you're suggesting is

16   that in itself is enough grounds for me to say, oh, you

17   should be able to find out about their litigation

18   funding agreement, I disagree.

19          MR. DEIERMANN:  I'm not -- I'm not saying

20   that, Your Honor.

21          THE COURT:  Okay.

22          MR. DEIERMANN:  If I said that -- if I said

23   that, I misspoke.

24          What -- what I was trying  to focus on were

25   questions that we're asking in the deposition, and this

1    is all also going to tie into some other document

2    disputes and RFA disputes that aren't before you right

3    now.

4              THE COURT:  Okay.

5              MR. DEIERMANN:  But it does tie into the

6    specific questions that we're asking in the deposition.

7              Put aside the funding agreement for a second.

8    If Legalist is providing input to LST as to what it

9    should or shouldn't do, I don't see how that's covered

10   by a privilege, and I think that information is

11   discoverable.

12             So it's a two-step process.  One is the

13   privilege.  And then depending upon which way the

14   information is going, whether it's going from LST to

15   Legalist or Legalist to LST, if it's going from LST to

16   Legalist and the question is whether or not there's

17   been a waiver, that brings you to the common legal

18   interest.

19             So separate and distinct from the funding

20   agreement per se --

21             THE COURT:  Right.

22             MR. DEIERMANN:  -- it's the question of what

23   input has Legalist has provided  because I don't think

24   that's covered by a privilege.

25             THE COURT:  Okay.  You're going to have to

1    break communications between the litigation funder and

2    the Plaintiffs because that's obviously not something

3    that's readily -- that I can draw a clear line about

4    without seeing the specifics of the information you're

5    looking for.

6            And looking at, for example, this deposition

7    transcript, in this particular deposition where I

8    already pointed to the witness is asked whether

9    Legalist provided an evaluation or assessment of any

10   claims.  And Ms. Warr permits him to give a yes or no

11   answer.  And his answer is, "No, that he's aware of."

12           So I'm not sure what more than that you would

13   have been able to get in terms of or you were looking

14   for in terms of asking this witness about contributions

15   Legalist was making to the governing of the litigation

16   strategies, but I do not have this memorized.

17           And I'm sure that you can tell me more about

18   the things that you asked him and why you should have

19   been able to get the answers, and definitely more than

20   we're going to be able to address today because I do

21   have to leave soon.

22           But the -- I don't think it's the same

23   question.  It's obviously not a question that -- I

24   don't think the second part of that specifically gives

25   us information that may or may not have been discussed

1    in the presence of people who -- you know, who related

2    to the litigation funder.

3        That is not the same question as can you

4    discover the documents or the information about the

5    relationship between the funder and the Plaintiff.

6        And so if you have specific pieces of

7    information you have thought and you believe you have

8    been improperly denied that information, then please by

9    all means write it up and tell me about it.  You have

10   ten days from today.

11       Is there anything else related to this sort

12   of litigation funding question?

13       I don't think we're going to get to your

14   other question today I'm sorry to say.

15       But related to litigation funding questions

16   that I should consider while we're on this call.

17   Obviously, I'm not able to give you pretty decisive

18   answers on anything, but let's say there's a chance.

19       MR. DEIERMANN:  Your Honor, I think from our

20   perspective -- I mean, there are other possible reasons

21   of relevance pertaining to what may have been discussed

22   between LST and Legalist.

23       "Was there any discussion with respect to the

24   values of the trade secrets that allegedly are at

25   issue?"

1          THE COURT:  Okay.

2          MR. DEIERMANN:  "No."

3          As I'm sitting here, can I tell you that that

4     was or wasn't discussed?  No.  But to the extent that

5     that was discussed that could be relevant.

6          THE COURT:  Okay.

7          MR. DEIERMANN:  To the extent there was any

8     discussion as to whether patient facing information was

9     trade secret.  For the life of us we can't figure out

10    how patient facing information -- you know, you plug in

11    the BJC as an example.  You plug in the BJC MyChart or

12    the St. Luke's MyChart.

13         THE COURT:  Okay.  I'm going to say, again,

14    though, how that -- that information you're talking

15    about is plainly relevant.

16         What they told their litigation funder about

17    that information is a different question that involves

18    potential issues of privilege in addition to the

19    general question of why is it relevant what they told

20    their litigation funder as opposed to just what

21    actually is the case.

22         And isn't there a better way to get at what

23    actually is the case than asking questions about their

24    relationship with their litigation funder?

25         MR. DEIERMANN:  To the extent that what they

```
1    told the litigation funder is different than what
2    they're telling us, it goes to credibility.
3              So to answer your question --
4              THE COURT:  I can see that, but that seems
5    like it would be the basis for a fishing expedition
6    about litigation funder communications in every
7    litigation involving a litigation funder.
8              And given what I'm reading in the case law,
9    it doesn't sound like in every single case there is a
10   basis for discovering communications with litigation
11   funders.
12             It sounds like it's the opposite.   The
13   general presumption is against the discovery of that
14   kind of information.
15             MR. DEIERMANN:  And, Your Honor, you're
16   right.  Probably the easiest thing to do is for us to
17   brief the issue.
18             THE COURT:  Yes.
19             MR. DEIERMANN:  There are a number -- there
20   are a number of cases that have some broad
21   pronouncements.   And as you can tell, I've read a few
22   of them.
23             A lot of those cases involve the fact that
24   the Court says there are 29 documents in dispute.  When
25   you look at it, you realize there are a number of other
```

1   documents and a number of other things that have

2   already been produced.

3          One of the cases talked about the litigation

4   funding issue that noted that I'm going to cut it off

5   here.  By the way, there was already someone who was

6   deposed to talk about all of this stuff.

7          So it -- and when I say "deposed," I think it

8   was the litigation funder who was deposed.

9          THE COURT:  Okay.

10          MR. DEIERMANN:  So, again, I think your point

11   is context is important, facts are important.

12          THE COURT:  Yes.

13          MR. DEIERMANN:  We will brief it.

14          I am going to talk out of turn here because I

15   haven't spoken with the other members of our team, but

16   in light of the Thanksgiving holidays --

17          THE COURT:  Yes, you can have longer than 10

18   days.

19          MR. DEIERMANN:  Thank you very much.

20          THE COURT:  You can have let's say -- well,

21   when is your -- when does the discovery close?

22          MR. DEIERMANN:  Your Honor, that's -- the

23   parties have submitted a proposed amended case

24   management order.  I don't believe the Court has

25   entered that.  There were a couple of issues that were

1   discussed in that context.

2           THE COURT:  Okay.

3           MR. DEIERMANN:  What was proposed was

4   December 8th as being the fact discovery cutoff that

5   was also subject to some outstanding or open discovery

6   issues.

7           So I'm going to say December 8th, but that's

8   not what you've entered at this point.

9           THE COURT:  Okay.  So the proposal is

10  December 8th.

11          Now, that gives you 14 days after that to

12  file any discovery motions.  So right up to until

13  Christmas we're right there before it to file any

14  remaining discovery-related motions.

15          It's going to be hard for me to have five

16  joint teleconferences with you the week -- the first

17  two weeks of December as I have trials in both of those

18  weeks.

19          But it may be that I just have to let you go

20  and flesh your hearts out without even bothering to

21  have these conversations.  But this one wasn't the most

22  productive I wouldn't say necessarily from my point of

23  view of me giving you any help.  Then maybe it's --

24  that's for the best anyway.

25          So we may just dispense with this requirement

1    so that you can just get on with briefing the remaining

2    discovery issues.

3              I'm not saying yes or no on your CMO.  I'll

4    give you 10 days from today, so 11/30.  So just me

5    speaking out of turn, too, because usually they don't

6    trust me with calendaring things around here, not the

7    best idea.

8              Can you -- the 30th is, you know, four days

9    after Thanksgiving, everyone is back from Thanksgiving.

10   The 1st would be -- how about until Monday the 4th for

11   the motion to compel?  And then I could do a few extra

12   days, an extra weekend, a full week after Thanksgiving

13   and also gives opposing counsel time to respond before

14   the next holiday is upon us.

15             And on your other questions -- I do need to

16   leave in two minutes -- the issue of the custodian,

17   which does seem like it would merit earlier -- an

18   earlier let me ask the following questions before I

19   charge forward.

20             What exactly is involved in collecting

21   custodian communications?  Nuts and bolts.

22             MR. HOOPS:  This is Jeff Hoops speaking on

23   behalf of Myia, Your Honor.

24             I mean, what it would involve would be having

25   our third-party document vendor going to Myia for

1    another time, having them do a forensic collection of

2    the requesting custodian.  We would then need to, you

3    know, transfer that information to our system.

4         We would then have to go through and review

5    those documents, you know, for responsiveness as we

6    have all the others note.  We've produced, I think,

7    over 50,000 documents in this case, which I think is

8    more than any other party.

9         So, you know, we would have to, you know,

10   send it to additional attorneys for viewing those

11   documents for responsiveness, relevance, privilege, and

12   then put them together in production to produce, so,

13   you know, that takes a little bit of time to do.

14             THE COURT:  Okay.

15             MR. HOOPS:  So, I mean, it is a -- there's a

16   cost and a, you know, time burden associated with that.

17             THE COURT:  Understood.

18         Is there any dispute that these individuals

19   took screenshots or the like of the products and sent

20   them to the development team?

21             MR. HOOPS:  From our perspective, I mean, no.

22   I mean, as that's -- that's -- I would -- I believe we

23   stated it in our position they cite at least one or two

24   of those communications.

25         So, no, there is -- it is undisputed that

1    there were screenshots taken.

2            Then our position is that it's not

3    convenient for Myia to have to go and collect and

4    produce -- review and produce those documents because

5    to the extent that -- those individuals that they're

6    seeking are not developers or designers.  They're more

7    in the nature of outtake customer relations on the part

8    of Myia.

9            THE COURT:  Let me -- I'm sorry.   Just in

10   the interest of time.

11           MR. HOOPS:  Yeah.

12           THE COURT:  So they communicate to the

13   development team about the LifeScience product;

14   correct?

15           MR. HOOPS:  Yes.   Correct.

16           And so these communications, you know, are

17   obviously to be safe are captured -- to be captured in

18   what we have collected, reviewed, and produced.   So

19   you have --

20           THE COURT:  So there are four people's

21   accounts that have been deleted, correct, that they

22   could have communicated with?

23           MR. HOOPS:  There are four individuals whose

24   e-mails we no longer have.  We do have their instant

25   messages.  So we have reviewed, produced all those.  I

1    think that, in fact, you know, shows some of the

2    screenshots that are alluded to.

3              But it is true, that, yes, there are four

4    individuals for which we do not have their e-mails

5    accessible anymore at the time of litigation.

6              THE COURT:  But there were communications by

7    e-mail between these two individuals who took

8    screenshots of the LST product and sent them to the

9    development team.

10             If there were communications between them and

11   the other members of the development team whose

12   accounts have been deleted, would those have been

13   produced?

14             MR. HOOPS:  Assuming that they were not --

15   that there were not other members of the development

16   team on those communications other than those four,

17   which, again in my understanding and review of the

18   documents that's unlikely because these things were

19   sent out to large groups of people.

20             THE COURT:  Right.

21             MR. HOOPS:  But, yes, if -- if there were

22   e-mails -- and just e-mails, not just (distorted

23   audio).

24             If there were e-mails sent by these two

25   individuals to only those four then, yes, there would

1    be -- they would not have been produced or collected in

2    the case.

3            THE COURT:  Ms. Warr, what are you seeking

4    beyond the kind of communication I just described?

5            MS. WARR:    Your Honor, I think that

6    generally is what we're seeking is the communications

7    where these individuals access the LST system, took

8    information about it, including screenshots, notes,

9    other types of information and as we understand sent it

10   to the development team.

11           THE COURT:  And the communications do have to

12   suggest that there might have been communications with

13   those four members whose accounts don't exist anymore?

14           MS. WARR:  I think that's correct, Your

15   Honor.

16           The communications tend to indicate that

17   these individuals were sending it to various members of

18   the development team.  There were times where people

19   communicated with the development team were at large.

20   There were times where they seemed to communicate

21   individually to people based on what they were doing at

22   that moment.

23           And parts of -- you know, as you can see from

24   the documents that we did cite, there were videos and

25   screenshots.  We don't have those actual videos and

1    screenshots because other people were talking about

2    that communication, but it was not a part of the actual

3    production in this case.  So we can see that it

4    exists, but we don't have it.

5            MR. HOOPS:  To respond briefly to that point,

6    there is a video cited in their position statement in

7    the memo.  We're investigating to see if we have that

8    video and can produce it.  I mean, that's not

9    something that was raised previously.  So we're happy

10   to do that.

11           Anyway, that's just to respond to the point

12   of the video that --

13           THE COURT:  I saw that in your papers, and I

14   appreciate that.

15           MR. HOOPS:  Yeah.

16           THE COURT:  That's the sort of cooperation

17   we're looking for from everyone.  So that would be

18   great if you looked for whatever you know to be

19   relevant and distinct and discoverable that has not yet

20   been produced.

21           I have to say based on what I've seen were I

22   to receive a motion to compel for the e-mails from

23   these individuals to the development team, particularly

24   those whose -- whose accounts have been deleted for a

25   total -- I'm not accusing anyone of anything serious.

1    I'm just saying they don't exist anymore, so the only

2    way to get these e-mails is to consult the e-mail

3    accounts of the individuals who sent them.

4            Given who these people are and the role that

5    they played in the case, I would be inclined to grant

6    that motion.

7            Now, again, there might be more that you can

8    tell me than you've told me in these three days (sic)

9    why that information -- or these two pages why that has

10   to be protected, but I'm not inclined to have another

11   role hearing so that I can tell you what I'm telling

12   you now, which is based on what I'm seeing or what I've

13   seen and what I've heard just now, I would grant that

14   motion to compel.

15           So go forth and act accordingly.  There's ten

16   days from -- well, everybody can have until Monday the

17   4th to file any motion to compel based on information

18   that we discussed today, motion to compel, motion for

19   protective order.

20           And please -- everybody have a great

21   Thanksgiving.  And if around that you can also have

22   lot of productive conversations and negotiations in

23   this case to save us all a very busy December, that

24   wouldn't be the worst either.

25           Okay.  Thanks, everyone.  I'm sorry to cut

1    it off so abruptly, but I do need to be somewhere.

2    We're adjourned.

3              MR. DEIERMANN:  Thanks, Judge.

4              MS. WARR:  Thanks, Your Honor.   Happy

5    Thanksgiving.

6              THE COURT:  You too.

7              (PROCEEDINGS CONCLUDED AT 3:05 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2

3           I, Alison M. Garagnani, Registered Merit

4    Reporter and Certified Realtime Reporter, hereby

5    certify that I am a duly appointed Official Court

6    Reporter of the United States District Court for the

7    Eastern District of Missouri.

8               I further certify that the foregoing is a

9    true and accurate transcript of the proceedings held in

10   the above-entitled case and that said transcript is a

11   true and correct transcription of my stenographic

12   notes.

13              I further certify that this transcript

14   contains pages 1 through 72 inclusive and that this

15   reporter takes no responsibility for missing or damaged

16   pages of this transcript when same transcript is copied

17   by any party other than this reporter.

18              Dated Cape Girardeau, Missouri, this 25th day

19   of November, 2023.

20

21

22   ------------------------------------------
     /s/Alison M. Garagnani
     Alison M. Garagnani, CCR, CSR, RMR.
23   Official Court Reporter

24

25
```